639 So.2d 888 (1994)
STATE of Louisiana
v.
Miguel KELLY.
No. 92-KA-2446.
Court of Appeal of Louisiana, Fourth Circuit.
July 8, 1994.
*889 Harry F. Connick, Dist. Atty., Susan M. Erlanger, Asst. Dist. Atty., New Orleans, for plaintiff/appellee.
Darryl A. Derbigny, Supervising Atty., Todd Musgrave, Student Practitioner, New Orleans, for defendant/appellant.
Before BARRY, BYRNES, and ARMSTRONG, JJ.
BARRY, Judge.
The defendant was indicted for second degree murder and convicted of manslaughter. La.R.S. 14:31. He was sentenced as a second offender to forty-two years at hard labor without benefit of probation, suspension of sentence or good time.
On the evening of August 22, 1988 Leonard Nelson was shot and killed while in the Lafitte Housing Project. Nelson's companions, Kevin Kemp and Eric Hill, identified the defendant as the man who shot Nelson. The defendant fled and in June 1991 he was arrested in California.
An autopsy revealed that Nelson suffered one gunshot wound to the back which passed through a lung and a major vein to the heart. It was estimated that Nelson would have been able to run a short distance prior to collapsing. The forensic pathologist testified that the front end of the bullet which was retrieved from the victim was flattened due to having hit a rib. There was no indication that the bullet ricocheted off another object prior to entering the victim. The forensic scientist estimated that the bullet was fired from at least three feet from the victim.
Prior to the shooting the victim, Kemp and Hill were sitting on the porch of Kemp's mother's house at 1730 St. Peter. The victim's mother and younger brother Cory arrived and spoke briefly with the victim. They continued on to 1722 St. Peter where the victim's grandmother lived. While in the grandmother's apartment Cory and his cousin looked out a window and saw the defendant and a young male walking through a driveway in the project. The defendant was carrying a gun. Cory's mother looked out the window and saw a man with a gun. Ms. Nelson testified that because her nephew and nieces were playing in the courtyard, she ran downstairs to warn the children to come inside. When she reached the bottom of the stairs she heard three or four gunshots, looked outside, and saw her son running across the courtyard. Her sister, who lived nearby, soon came to the grandmother's house and told her that her son had been shot. She then ran to her sister's house and found her son. Ms. Nelson testified that *890 prior to the shooting she did not see her son, Kemp, or Hill with a gun.
Kevin Kemp testified that he, Hill, Nelson, and another man were sitting on his mother's porch at 1730 St. Peter on the afternoon of the shooting. He testified that the defendant and a companion passed by the porch and stared at them. Kemp said that he and the defendant had had fights in the past but had not seen each other for two years. Kemp testified that the defendant and his companion went to the porch next door where the defendant's sister lived, knocked on the door, but there was no answer. The defendant and his companion left and walked around the building. Soon thereafter the defendant reappeared on the other side of the building and asked Kemp "What's up?" Kemp stood up and the defendant pulled a gun and began shooting. Kemp testified that Nelson was hit in the back. Nelson then ran across the courtyard to his aunt's house and the defendant fled. Kemp denied that he or his companions had a gun. Kemp admitted prior misdemeanor convictions for possession of marijuana, shoplifting and theft, and a felony conviction for discharging a firearm.
Eric Hill testified that he was Nelson's uncle. He said that he knew the defendant and did not have any trouble with him prior to the shooting. Hill testified that after the defendant and his companion left the porch where the defendant's sister lived, they went around the building and reappeared a few minutes later. Hill testified that after asking Kemp "What's up?", the defendant pulled a gun and shot at them. Hill testified that he ran through the doorway of the porch and up the stairs, Kemp ran next door to the porch on the other side, and Nelson ran across the courtyard to his aunt's house. He testified that neither he nor his companions had a gun. Hill admitted prior convictions for being in possession of stolen property and purse snatching.
Sandra Nelson, the victim's aunt, testified that she lived at 1705 St. Peter, across the courtyard from Kemp's mother. She testified that when she heard the first shot she ran to her upper porch and saw a man shooting at the porch where Nelson, Kemp, and Hill were sitting. She testified that she did not see any of the three with a gun. She testified that when Nelson got shot he ran to her apartment and collapsed inside.
Troy Hubbard testified that in the summer of 1988 the defendant was dating his aunt. He said that he accompanied the defendant to the Lafitte Project on the early evening of the shooting to visit the defendant's sister. He saw some men on the porch next to the sister's porch. He testified that when no one answered the sister's door, he and the defendant left and walked around the building. The defendant told him that he had had a shootout with one of the men on the porch, and he showed Hubbard a gun. As the defendant and Hubbard walked back around the building, the defendant warned him to back off so that he would not get in trouble. Hubbard testified that he stayed back and soon heard four to five shots. He then ran to the defendant's car and the defendant joined him. Hubbard testified that the defendant told him that he had "missed the wrong guy." The defendant drove Hubbard to Hubbard's grandmother's house, and asked him to unload the empty shells from the gun. Hubbard testified that his aunt later told him that she and the defendant were going to Baton Rouge and then to California. Hubbard testified that he waited three months before contacting the police because he was afraid of the defendant. Hubbard admitted a prior conviction for simple burglary. He denied any deal with the State in exchange for his testimony.
Fay Green, the defendant's sister, testified that her brother and Kemp had gotten into many fights in the past.
The defendant testified that he had gone to the Lafitte Project that day first to visit his uncle, who lived on the "Johnson courtyard." While in the courtyard he encountered Hubbard who asked if he knew where drugs could be purchased. The defendant testified that he directed Hubbard to a supplier and then he went alone to visit his sister in the St. Peter courtyard. The defendant admitted carrying a gun for protection from Kemp and others. The defendant testified that while knocking on his sister's door, he noticed Kemp, Hill, and another man standing on the porch next door. Kemp kept staring *891 at him. When his sister did not answer the door, he walked around the building and knocked on the back door. The defendant testified that when no one answered that door he walked around the building, intending to return to the Johnson courtyard. He testified that as he passed through the driveway, Kemp shot at him. The defendant said that he fired back and ran. Later that night he found out that someone had been shot. He disposed of the gun in the St. Bernard Project. The defendant admitted that he then moved to California and used an alias. He said that he did not turn himself in because he did not want to go back to jail. He served time for being in possession of stolen property. He also admitted that he had his gun in his hand as he walked back through the driveway just prior to the shooting.
Defendant's counsel requests a review of the record for errors patent and claims the sentence is excessive.
In a supplemental pro se brief the defendant claims the trial court gave erroneous jury instructions and trial counsel was ineffective.

ERROR PATENT
An errors patent review reveals that the trial court ordered the defendant's sentence be served without probation or suspension of sentence and "under Title 15, Section 571.3, section `C', the diminution of sentence shall not be allowed." A trial court may not deny good time eligibility even though the defendant may be ineligible by law pursuant to La.R.S. 15:571.3 C. State v. Langlois, 620 So.2d 1193 (La.App. 4th Cir.1993), writ denied, 625 So.2d 1042 (La.1993).
The defendant's sentence is amended to delete the prohibition of good time.

EXCESSIVE SENTENCE
The defendant argues that the 42 year sentence is excessive. Although defense counsel did not file a motion to reconsider which is required by La.C.Cr.P. art. 881.1, counsel did note an objection to the original and enhanced sentence. Such an oral objection is sufficient to preserve on appeal the issue of an excessive sentence. State v. Caldwell, 620 So.2d 859 (La.1993); State v. Singleton, 614 So.2d 1242 (La.1993).
After the jury verdict the trial court ordered a presentence investigation, but it was cancelled after the defendant escaped from Orleans Parish Prison and was arrested in Florida. The court sentenced the defendant to the statutory maximum of 21 years without benefit of probation or suspension of sentence. Sentencing occurred on August 7, 1992, after the Felony Sentencing Guidelines, LAC Title 22:IX, § 101 et seq. were effective. The court cited aggravating factors and discounted the mitigating factors in the guidelines of pre-1992 La.C.Cr.P. art. 894.1: (1) after hearing the circumstances of the death there would be an undue risk that the defendant would commit another crime during any period of suspension or probation; (2) the defendant was in need of correctional treatment or a custodial environment; (3) a lesser sentence would deprecate the seriousness of the crime; (4) the defendant's conduct caused serious harm not only to the 15 year-old victim who was an innocent bystander, but also to his family; (5) the defendant was firing his weapon at someone so that he had the intent to cause harm; (6) the defendant did not act under provocation since the victim did not induce or facilitate the commission of the crime; (7) the defendant has no way to compensate the victim; (8) the defendant's conduct was the result of circumstances that are likely to recur; (9) the character and attitude of the defendant indicate that he is likely to commit another crime. After finding the defendant to be a second offender, the trial court again noted the applicable aggravating factors of pre-1992 La.C.Cr.P. art. 894.1(A) and the absence of mitigating factors under art. 894.1(B). The court then sentenced the defendant to the maximum, 42 years, without probation, suspension of sentence or good time.[1]
The Guidelines are mandatory but only in the sense that the trial court must consider them and, if a gross deviation is necessary, must declare for the record its *892 reasons for the departure. Although the trial court retains its discretion to grossly deviate from the Guidelines where the record supports the deviation, the court must specify the aggravating or mitigating circumstances to justify the departure and the factual basis. LAC Title 22:IX, § 209A(4) of the Guidelines; State v. Smith, 629 So.2d 333 (La.1993), rehearing granted. LAC Title 22:IX, § 209B and C list aggravating and mitigating circumstances to support a departure from the designated range; however, they also include an omnibus clause to cover any consideration the trial court might consider relevant.
The sentencing grid (according to the three point value of the crime and the defendant's status indicating a range of 210-240 months) does not determine the appropriate sentence. Under La.R.S. 15:529.1 the defendant's sentence as a second offender had a mandatory minimum of 10½ years (½ the maximum sentence of 21 years under La.R.S. 14:31 at the time of the offense) and a maximum of 42 years (twice the maximum of 21 years). Section 211 of the Guidelines provides that, if a mandatory term must be imposed which exceeds the maximum under the grid, the court should impose the minimum sentence required by law unless aggravating circumstances justify imposition of a more severe sentence.
The trial court justified imposition of the 42 year maximum sentence in lengthy reasons, even though it used the wording of the pre-1992 guidelines. The facts in the record justify departure from the designated sentencing range and constitute aggravating circumstances under § 209B of the Guidelines. The defendant was charged with second degree murder. He intended to kill Kemp, the victim's friend, but killed Leonard, an innocent bystander. He previously had a shoot-out with Kemp and fired four or five shots at the porch the day he killed Leonard. He created a risk of death or bodily harm to more than one person. § 209B(5). The offense resulted in the death of the victim and a significant loss to the victim's family. § 209B(9). The defendant used a dangerous weapon, a gun. § 209B(10). Those aggravating circumstances overlap the factors enunciated by the trial court at the sentencing.
Deviation from the Guidelines was clearly justified. We determine that the defendant's sentence is not unconstitutionally excessive.
This assignment has no merit.

JURY INSTRUCTION
The defendant bases this assignment on Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), wherein the U.S. Supreme Court held that the reasonable doubt jury instruction violated a defendant's constitutional rights.
The Cage instruction was:
If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused. This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. It must be such doubt as would give rise to a grave uncertainty, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. It is an actual substantial doubt. It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a moral certainty. (emphasis added).
Id. at 40, 111 S.Ct. at 329.
Reasonable doubt was equated with a "grave uncertainty" and an "actual substantial doubt." The jury was told that what was required was a "moral certainty" that the defendant was guilty. The Supreme Court found that "substantial" and "grave" as commonly understood suggested a higher degree of doubt than what was required for acquittal under the reasonable doubt standard. When those statements were considered with the reference to "moral certainty" rather than evidentiary certainty, it became "clear that a reasonable juror could have interpreted the *893 instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." Id. at 41, 111 S.Ct. at 330.
The standard to be used when considering an ambiguous and allegedly improper jury instruction was considered again in Estelle v. McGuire, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The U.S. Supreme Court inquired as to "`whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." Estelle, at ___, 112 S.Ct. at 482, quoting Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). In a footnote the court acknowledged that language in later cases including Cage, 498 U.S. at 39, 111 S.Ct. at 328, and Yates v. Evatt, 500 U.S. 391, 111 S.Ct. 1884, 1892, 114 L.Ed.2d 432 (1991), where the standard was expressed as: "We think a reasonable juror would have understood the [instruction] to mean ...," might be read as endorsing a different standard of review for jury instructions. The Court declared:
In Boyde, however, we made it a point to settle on a single standard of review for jury instructionsthe `reasonable likelihood' standardafter considering the many different phrasings that had previously been used by this Court.... So that we may once again speak with one voice on this issue, we now disapprove the standard of review language in Cage and Yates, and reaffirm the standard set out in Boyde.

Estelle, 502 U.S. at ___, 112 S.Ct. at 482, fn. 4.
In Boyde, 494 U.S. at 380-82, 110 S.Ct. at 1198, handed down before Cage, the Supreme Court discussed the standard: "This `reasonable likelihood' standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical `reasonable' juror could or might have interpreted the instruction."
Very recently, in Victor v. Nebraska, 511 U.S. ___, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), the Supreme Court reaffirmed the standard enunciated in Boyde/Estelle. The Court stated that "the proper inquiry is not whether the instruction `could have' been applied in [sic] unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it." Id. 511 U.S. at ___, at 1243. The Nebraska instruction which included the terms "moral certainty" and "actual and substantial doubt" passed constitutional muster. Id. 511 U.S. at ___, at 1251.[2] Also in Victor the Supreme Court considered Sandoval v. California, where the reasonable doubt instruction included the terms "moral evidence," "moral certainty" and "not a mere possible doubt," and found the instruction passed constitutional muster under Boyde.
In State v. Smith, 637 So.2d 398, 403 (La. 1994), No. 91-KA-0749, the Louisiana Supreme Court again considered a reasonable doubt instruction and noted:
One might conclude that the United States Supreme Court has retrenched from its position in Cage.... In reviewing a suspect jury charge on reasonable doubt, we now are instructed ... to determine whether it is reasonably likely that an instruction was applied improperly, rather than whether it is only possible that the misapplication occurred. Mere conjecture concerning a juror's response to a charge, *894 a conjecture encouraged in Cage, is no longer favored.
Not only did that Court change the standard for the review of an allegedly erroneous jury charge on reasonable doubt (from that recited in Cage), but they also seem to have drawn a fine line to distinguish the similarly suspect reasonable doubt charges in California and in Nebraska from the one given in Cage. (footnote omitted).
The jury was given the following reasonable doubt instruction in Smith, 637 So.2d at 399:
The defendant is presumed to be innocent until he is proved guilty beyond a reasonable doubt. The consequence of this rule is that he is not required to prove his innocence but may rest upon the presumption in his favor until it is overcome by positive affirmative proof.
The onus, therefore, is on the State to establish to your satisfaction and beyond a reasonable doubt, the guilt of the accused as to the crime charged or any lesser one included in it.
If you entertain any reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your sworn duty to give him the benefit of that doubt and return a verdict of acquittal.
Even where the evidence demonstrates a probability of guilt, yet, if it does not establish it beyond a reasonable doubt, you must acquit the accused.
This doubt must be a reasonable one, that is one founded upon a real, tangible, substantial basis and and not upon mere caprice, fancy or conjecture. It must be such a doubt as would give rise to a grave uncertainty raised in your minds by reason of the unsatisfactory character of the evidence; one that would make you feel that you had not an abiding conviction to a moral certainty of the defendant's guilt.
If after giving a fair and impartial consideration to all the facts in the case you find the evidence unsatisfactory upon any single point indispensably necessary to constitute the defendant's guilt, this would give rise to such a reasonable doubt as would justify you in rendering a verdict of not guilty.
A reasonable doubt is not a mere possible doubt. It should be an actual or substantial doubt. It is such a doubt as a reasonable person would seriously entertain. It is a serious doubt for which you could give a good reason.
Like Victor, the Smith charge included references to "moral certainty" and "substantial doubt." The Louisiana Supreme Court used the logic postured in Victor to allow those phrases in the Smith charge. By linking "moral certainty" to "abiding conviction" jurors were less likely to misunderstand and would be impressed with the need to determine the defendant's guilt with near certainty. The Court also used the U.S. Supreme Court's reasoning as to the California instruction including "moral certainty" at issue in Sandoval. In the next sentence of the charge after the one containing "moral certainty" the jurors were instructed that unsatisfactory evidence, on even a single point required to constitute guilt, should give rise to a reasonable doubt that would justify a not guilty verdict. Therefore, "moral certainty" would not likely be disassociated from the evidence in the case. Id. at 405.
As to "substantial doubt" in Smith the Court used the reasoning in Victor that the expression was acceptable because it simply informed the jurors that a reasonable doubt was more than a speculative one or one arising from mere possibility or fanciful conjecture. "Substantial" expressed an alternative definition of the word. It meant "not [just] seeming or imaginary" as opposed to "specified to a large degree." Id. at 405.
When considering the phrase "grave uncertainty" which was not in the jury charge in Victor (but in Cage), the Court used the Boyde standard of considering the relationship of the terms to the instruction as a whole (not as in Cage when the focus was on the suspect terms). The Court concluded that in the context of the entire charge with its other qualifying language "grave uncertainty" did not suggest a higher degree of doubt than required for acquittal under the reasonable doubt standard. The Court used the U.S. Supreme Court's discussion of "substantial doubt" which it felt applied to *895 "grave uncertainty". "Grave uncertainty" was used in the sense of existence rather than the magnitude or degree required to acquit. In contrast to "mere caprice, fancy or conjecture," the term "grave uncertainty" suggested that a reasonable doubt was more than speculative. The concerns in Cage that jurors would interpret "grave uncertainty" and "substantial doubt" together to produce an overstatement of the doubt required to acquit a defendant were alleviated by the separation of the terms in the Smith instruction. Id. at 406.
The Smith court applied Victor. The Court considered the whole instruction rather than isolating individual terms, noted distinctions between the Smith charge and the Cage charge, and used the reasonable likelihood standard of review (the Boyde standard reaffirmed in Victor) to find that the instruction was not constitutionally deficient. Id. at 406.
In this case the trial court originally gave an instruction very similar to the one in Smith (falling somewhere between the charges in Cage and Victor):
The consequence of this rule is that the defendant is not required to prove his innocence, but may rest upon the presumption in his favor until it is overcome by positive, affirmative proof.
* * * * * *
You [sic], Ladies and Gentlemen, entertain any reasonable doubt as to any fact or element necessary to constitute the defendant's guilty [sic], but if you do, it is your sworn duty to give him the benefit of that doubt, and return a verdict of Acquittal. Even where the evidence demonstrates a probability of guilt, yet, if it does not establish it beyond a reasonable doubt, you must acquit the defendant. This doubt must be a reasonable one. That is to say, one based on a real tangible, substantial basis and not upon mere caprice, fancy or conjecture. It must be such a doubt as would give rise to grave uncertainty raised in your minds by reason of the unsatisfactory character and the evidence; one that would make you feel that you had not an abiding conviction to a moral certainty of the defendant's guilt. If, after giving a fair and impartial consideration to all of the facts in the case, you find the evidence unsatisfactory upon any single point, indispensably necessary to constitute the defendant's guilt, this would give rise to such a reasonable doubt as would justify you in rendering a verdict of Not Guilty. The prosecution must establish guilt by legal and sufficient evidence beyond a reasonable doubt, but the rule does not go further and require a preponderance of testimony. It is incumbent upon the State to prove the offense charged, all legally included in the Bill of Information, to your satisfaction and beyond a reasonable doubt. It should be an actual or substantial doubt. It is such a doubt as a reasonable person would seriously entertain. (emphasis added)
Defense counsel objected to the use of "grave uncertainty." The trial court informed the jury of the properly lodged objection, removed the sentence containing the term and re-read the pertinent part of the instruction.[3]
As in Smith we conclude that by linking "moral certainty" to "abiding conviction" there is less likelihood that a juror misunderstood the meaning. He/she should realize the necessity to subjectively determine a defendant's guilt with near certainty. After considering the discussion in the next sentence of the instruction that unsatisfactory evidence on a single necessary point would justify a not guilty verdict, "moral certainty" would not likely be disassociated from the evidence.
"Substantial doubt" is acceptable because the term informed the jurors that a reasonable doubt was more than a speculative doubt. With the court's addition of the immediately preceding sentence declaring that reasonable doubt is "not a mere possible *896 doubt" when it reread the instruction, it is clear that was the purpose of the term. "Substantial" was an alternative definition of the word. It was used in the sense of the existence of the doubt, rather than the magnitude. It was used to mean "not [just] seeming or imaginary," as opposed to meaning "specified to a large degree."
The term "grave uncertainty" was deleted from the charge that was re-read to the jurors. However, if one argued that the first reading of the instruction including the phrase caused misunderstanding, the Smith court found the term was acceptable. The use of "grave uncertainty" in context with the entire charge with its qualifying language, in contrast to "mere caprice, fancy or conjecture," and separated from the term "substantial doubt" (much further separated here than in the Smith instruction), did not suggest a higher degree of doubt than that necessary for acquittal under the reasonable doubt standard.
There is no reasonable likelihood that the jurors understood the instruction to allow a conviction based on proof insufficient to meet the beyond a reasonable doubt standard of In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).
We therefore need not address the argument that the failure to object contemporaneously to the charge would bar relief.
This assignment has no merit.

INEFFECTIVE ASSISTANCE OF COUNSEL
The defendant argues that his counsel was ineffective because counsel: 1) failed to object to the improper jury instruction; 2) failed to file a motion for reconsideration of sentence; and 3) failed to file a motion to quash the bill of information.
Such claims are ordinarily raised by post-conviction relief. However, the issues may be addressed on appeal when the record contains the necessary evidence to evaluate the merits of the claims. State v. Seiss, 428 So.2d 444 (La.1983).
Under the two-tiered test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in order to substantiate a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and the deficiency caused prejudice. The defendant must make both showings to prove that counsel was so ineffective that the conviction must be reversed. Counsel's performance is deficient when it can be shown that counsel made errors so serious that he was not functioning as "counsel" guaranteed by the Sixth Amendment. To prove prejudice the defendant must show that counsel's errors were so serious as to deprive him of a fair trial with a reliable result. Id.; State v. Bell, 543 So.2d 965 (La.App. 4th Cir.1989). The defendant must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome. Strickland, 466 U.S. at 693-95, 104 S.Ct. at 2068.
Because the jury instruction was not improper, the first argument need not be discussed.
Although counsel failed to file a motion to reconsider the sentence, his verbal objection to the sentence was sufficient to preserve the issue for appeal. The defendant was not prejudiced.
The defendant also argues that counsel failed to file a motion to quash the bill of information based on the State's failure to bring him to trial within 120 days of the filing of the bill pursuant to La.C.Cr.P. art. 701. A statutory speedy trial claim is a pre-trial claim that becomes moot upon conviction. See State v. Johnson, 622 So.2d 845 (La.App. 4th Cir.1993).
Whether there was a violation of the defendant's constitutional right to a speedy trial under the Sixth Amendment is determined by a four part testthe length of delay, the reason for the delay, the defendant's assertion of his right and the prejudice. Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The length of the delay is the triggering factor. The Court must first find that the length of delay is presumptively oppressive before the *897 other three factors are considered. Id. See also Doggett v. United States, ___ U.S. ___, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992).
The defendant was indicted for second degree murder on July 18, 1991 and trial commenced on April 7, 1992. The defendant was at large from 1988 until his arrest in 1991. The delay was not prejudicial in light of the seriousness of the crime. The dates for motions hearings and trial were continued several times due to the absence of a police officer, defense counsel's illness, other trials were in progress, and continuances for unspecified reasons. The defendant alleges as prejudice that he received a 42 year sentence. Less than nine months elapsed between his indictment and trial. Under these circumstances the defendant's constitutional right to a speedy trial was not violated.
This argument has no merit.
The conviction is affirmed. The sentence as amended is affirmed.
CONVICTION AFFIRMED; SENTENCE AS AMENDED AFFIRMED.
NOTES
[1] The prohibition of good time eligibility was discussed in the error patent discussion.
[2] The instruction was: "`Reasonable doubt' is such a doubt as would cause a reasonable and prudent person, in one of the graver and more important transactions of life, to pause and hesitate before taking the represented facts as true and relying and acting thereon. It is such a doubt as will not permit you, after full, fair, and impartial consideration of all the evidence, to have an abiding conviction, to a moral certainty, of the guilt of the accused. At the same time, absolute or mathematical certainty is not required. You may be convinced of the truth of a fact beyond a reasonable doubt and yet be fully aware that possibly you may be mistaken. You may find an accused guilty upon the strong probabilities of the case, provided such probabilities are strong enough to exclude any doubt of his guilt that is reasonable. A reasonable doubt is an actual and substantial doubt arising from the evidence, from the facts or circumstances shown by the evidence, or from the lack of evidence on the part of the state, as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture." (emphasis added) Victor, 511 U.S. at ___, 114 S.Ct. at 1249.
[3] The instruction reread to the jury was the same except for a few punctuation differences and a word or two added or deleted until the last two sentences. Before the second to last sentence the following was added: "A reasonable doubt is not a mere possible doubt." After the last sentence was added: "It is a serious doubt for which you could give a good reason."