EDWIN A. LOMBARD, Judge.
 

 LThe defendant, Quantrell Kelson, appeals his conviction and sentence for manslaughter. After review of the record in light of the applicable law and arguments of the parties, we affirm the defendant’s conviction and sentence.
 

 Relevant Procedural History
 

 On February 6, 2003, the defendant was indicted for the second degree murder of Louis Kaplan
 
 [1]
 
 and, on June 8, 2005, a jury convicted him of the responsive verdict of manslaughter. Shortly thereafter, he was sentenced to serve forty years at hard labor, the State filed a multiple bill, and as a second offender he was sentenced to serve forty-five years at hard labor. The defendant filed a motion for appeal which was granted but due to Hurricane Katrina the record was not lodged in this court until May 1, 2006. The record was incomplete, however, lacking both trial and multiple bill hearing transcripts that were lost in the aftermath of Katrina and, accordingly, the defendant’s conviction and sentence were reversed and the matter was remanded to the trial court.
 
 State v. Kelson,
 
 unpub. 2006-0477 (La.App. 4 Cir. 7/27/06).
 

 The defendant was charged with manslaughter and, on June 13, 2008, after a three-day trial, he was found guilty as charged by a jury. The defendant was | sentenced to forty years at hard labor, the State filed a multiple bill, his original sentence was vacated, and he was sentenced as a second offender to eighty years at hard labor. He is now before this court on appeal of that conviction and sentence.
 

 Relevant Facts
 

 On December 5, 2002, Louis Kaplan was severely beaten and dropped in a dumpster near his apartment in Algiers. Although police officers found him alive in the dumpster, he died several days later in
 
 *1197
 
 a hospital. The following evidence was adduced at trial.
 

 Earlier in the evening, Keisha Price, the decedent’s fifteen year-old girlfriend was sleeping in the bedroom of their apartment while the decedent entertained friends (subsequently identified as the defendant and Jeremy Johnson) in the living room. The defendant, unknown to her at the time, awakened her by walking into the bedroom and grabbing her by the throat. He left the bedroom and Ms. Price went to the bedroom door, heard Kaplan screaming for help, and saw him pinned down on the sofa by the defendant and Johnson. Blood was on the floor, walls, and sofa and Kaplan’s clothing was torn as he tried to get away from the two men, yelling, “Qua-nie, stop!” Kaplan tried to escape, but the men grabbed him, punched and dragged him out the door and down the stairwell. Johnson observed Ms. Price in the doorway and told the defendant to get her. She ran back into the bedroom, locked the door, and jumped out the window. After escaping, Ms. Price ran through the back yard until she saw two women from the complex. She went to the apartment of one of the women and called the police. The police arrived within a few minutes. Ms. Price gave the officers an oral statement, | including a description of the perpetrators, and subsequently viewed the defendants and identified them as the men who were in the apartment, beat Kaplan, and took him away. She reiterated that defendant was the person who came into the bedroom and that she saw him beating Kaplan.
 

 An autopsy revealed that Kaplan died of blunt force trauma, both due to the severe beating of his head that caused swelling of his brain, as well as injuries to his abdomen that lacerated a vein in his bowels and caused massive loss of blood. Patterned marks found on his abdomen directly above the site of the injuries were consistent with shoe prints and the marks and injuries were consistent with Kaplan being stomped in the abdomen.
 

 Officer Richard Sasnett of the New Orleans Police Department (NOPD) and his partner responded to the first of several 911 calls just before 10:00 p.m. on December 5 and drove to 3813 Texas Drive. As they neared the scene, a hysterical young female (Ms. Price) flagged them down and told them that two men had broken into her apartment and were beating her boyfriend. Meanwhile, Officer Brian Sullivan and his partner, also of the NOPD, arrived on the scene and went to investigate a report of two men dumping a body in a nearby dumpster as Officer Sasnett and his partner proceeded to the apartment. The officers found a large amount of blood on the stairwell leading to an upstairs apartment, the door to Kaplan’s apartment covered in blood, and overturned furniture in the apartment indicating a struggle had occurred. Officer Sasnett followed the blood trail out of the apartment and around the building where he found a bloody knife on the ground before going to the nearby dumpster where Officer Sullivan and his partner had discovered Kap-lan, severely beaten and gasping under a layer of garbage bags. In response to a call for emergency assistance, firefighters arrived and removed |4Kaplan from the garbage dumpster. Kaplan was transported to the. hospital where he died several days later.
 

 Officer Sasnett broadcast the description of the perpetrators that he received from Ms. Price: two African-American males approximately twenty years old, both weighing approximately 180 pounds, one around 5'9" and the other around 6' tall. Officer Edgar Baron, di’iving in the vicinity, heard the broadcast and several minutes later saw two men fitting the de
 
 *1198
 
 scription approximately two or three blocks from the scene; both were wearing dark clothing and one was wearing a white headband. Officer Baron exited his car and identified himself, but the two men fled. Giving chase, Officer Baron caught Johnson, but the other man escaped. Officer Baron broadcast the direction he had taken and the defendant was captured shortly thereafter. Officer Baron took Johnson to the scene and Ms. Price identified him as one of the two assailants. He then took Johnson to the police station where Johnson asked to use the restroom. Suspecting that he was trying to discard evidence, Officer Baron conducted a full patdown. Noticing that Johnson’s sweatpants were inside out, he instructed Johnson to pull them down which revealed the outer layer covered in blood. In addition, Johnson had blood on his shoes. Officer Baron also found blood on the defendant’s clothing when he was apprehended.
 

 Officer Eric Boland, the officer who apprehended the defendant, took him to the scene and Ms. Price positively identified him. The defendant was taken to the police station, searched, and his bloody clothing was confiscated.
 

 Sidney Stridet of the NOPD Crime Lab collected evidence and took photographs of the crime scene. She collected two knives (a butter knife and a |ssteak knife) from the area and clothing from inside and around the dumpster, but did not attempt to lift fingerprints from the scene due to the large amount of blood.
 

 Thomas Redmann of the NOPD homicide investigation unit conducted the follow-up investigation upon Kaplan’s death. He was unable to take Ms. Price’s statement until a month after the incident and, because Kaplan died of blunt force trauma to his head and abdomen and he was unaware of any cutting injuries sustained by the decedent, did not have the blood on the knives tested. Buccal samples from Johnson and the defendant, along with their clothing and a sample from the decedent were submitted for testing.
 

 Joseph Tafaro, a NOPD criminalist, prepared samples from nine separate items of clothing that tested positive for blood and sent them for testing. Anne Montgomery, an expert in forensic DNA and molecular biology, compared bloodstain samples taken from Johnson’s and the defendant’s clothing with their buccal swabs and a blood sample taken from Kaplan. She concluded with a reasonable degree of scientific certainty that the blood found on the defendant’s jeans and sweater was that of the decedent.
 

 Assignment
 
 of Error I
 

 The defendant argues that the trial court erred by denying his challenges for cause for two potential jurors. He contends that the voir dire transcript reveals that these jurors could not be impartial, necessitating his use of peremptory challenges to remove them.
 

 Pursuant to La.Code Crim. Proc. art. 797, a potential juror may be challenged for cause for several reasons, including impartiality. When peremptory challenges were exhausted, the defendant need only show that the trial court abused its discretion by denying a challenge for cause because prejudice is |6 presumed.
 
 See State v. Lindsey,
 
 2006-0255 (La.1/17/07), 948 So.2d 105;
 
 State v. Juniors,
 
 2003-2425 (La.6/29/05), 915 So.2d 291. The trial court is vested with broad discretion in its ruling on a challenge for cause and, accordingly, the ruling will only be disturbed when review of the entire voir dire reveals that the ruling was an abuse of discretion.
 
 See State v. Campbell,
 
 2006-0286 (La.5/21/08), 983 So.2d 810. If, however, the juror who initially expressed a predisposition as to the outcome of a
 
 *1199
 
 trial subsequently exhibits under questioning an ability to disregard previous views and make a decision based on the evidence presented at trial, the challenge is properly denied.
 
 Lindsey,
 
 at p. 3, 948 So.2d at 107-108.
 

 In this case, the defendant exhausted his peremptory challenges, using two of them to excuse the two prospective jurors at issue. Both were interviewed during the second round of voir dire. The first, Bruce King, revealed he served on criminal juries during four prior terms of jury duty, the most recent of which was nine years prior to the defendant’s trial. He indicated that Daniel Breaux, murdered in 2004 as he left the Jazz Fest, was a friend and that he personally had been held up at gunpoint and had items stolen from a shed on his property. When asked if, given these occurrences, he could be fair and impartial, King responded, “I’d like to think that I could be, but I don’t know once it gets started.” However, he conceded that, “I could try.” Later, when the defense counsel asked if the jurors had any concerns that he had not covered, King reiterated his friendship with Breaux was a factor, “There would be an emotion — there could be an emotion to come up but if you choose me, I’ll do everything I can to be objective here.... I realize there is no connection, you know, so I think I can do it.” When asked if there was anything that could be done to eliminate this issue, King replied, “it’s my baggage, I don’t think you can do that.”
 

 |7In its challenge for cause, the defense conceded that King said the right words but argued “the reality is the totality of what he basically said in connection with this.” It was also noted that King himself brought up his concerns about his ability to be impartial during the defense voir dire. In further questioning in chambers, however, King stated that although Breaux was an old friend, he was not a close friend and he had not paid attention to the trial of the man charged with killing Breaux. The following colloquy then occurred:
 

 THE COURT:
 

 Were you so [affected] by that scenario that it would [affect] your ability to be fair and impartial here today with this young man?
 

 MR. KING:
 

 You know, I — I think I can be fair and impartial.
 

 THE COURT:
 

 Can you follow the law?
 

 MR. KING:
 

 Sure.
 

 THE COURT:
 

 Can you follow the law as it’s been explained to you?
 

 MR. KING:
 

 Oh, yeah.
 

 THE COURT:
 

 Was there any things [sic] that were a problem to you?
 

 MR. KING:
 

 No, no, there’s no problem, nothing that was a problem to me. I’m just, you know, trying to cast ahead, you know, as things develop, I might have some emotional reactions to the whole thing but, you know, everything that’s been said so far, I’m fine.
 

 King indicated that the fact that he had been the victim of burglaries would not affect his ability to be impartial. He stated that he had known Breaux prior to Breaux’s relocation to Houma after Breaux’s divorce. When defense counsel ^questioned him about whether he expected to suffer any outbursts if he found that he became emotional, King replied that there would be no outbursts. King observed, “From what you’ve told me about this case so far which is very little, it
 
 *1200
 
 sounds like a completely different kind of circumstance than Mr. Breaux.” In response to the court’s query as to whether similarities between the Breaux case and this one would cause him trouble in sitting in judgment, King replied, “I don’t think so.” After King left chambers, the defense counsel reurged his challenge for cause, noting that “I don’t think so” was equivocal but the court denied the challenge for cause.
 

 Although King initially admitted to some hesitance as to whether he could be fair and impartial, given his friendship with a murder victim in an unrelated case, he nonetheless concluded that the circumstances of the instant case were not the same as those in his friend’s murder and that the defendant was not involved in his friend’s murder. Moreover, King indicated that he could follow the law as given to him by the court and would have trouble sitting in judgment in this case. Under these circumstances, we do not find that trial court erred in denying the challenge for cause as to Bruce King.
 

 Similarly, the second challenged prospective juror, Patricia Robertson-Shaw, revealed that in 1986 she served on a murder trial which resulted in a conviction and that just prior to the defendant’s trial she served on a jury that resulted in a drug conviction. Moreover, a family member (her niece) had been murdered the previous year and she had “reservations in reference to that.” When asked, however, if she felt that “because of whatever emotions you’re feeling about that, you wouldn’t be able to sit and have an open mind and hear what the state has to say or if Mr. Kelson decides to take the stand, given what he’s accused of, would |9you be able to still listen to what he might have to say if he testifies and weigh that against everything else?,” Ms. Robertson-Shaw responded that she would try to be impartial and that she had no reason to believe that the defendant was involved with her niece’s murder. In response to the prosecutor’s question as to whether she could listen to the case and decide whether the State met its burden, not holding the murder of her niece against the defendant, she affirmatively responded, stating “I have my personal things and I’m dealing with my niece’s death but I think I can be [impartial].” Likewise, when defense counsel asked if steps could be taken to change her feeling or keep her from getting upset, Ms. Robertson-Shaw said,
 
 “I
 
 think I can be okay.” The defense counsel reiterated that “even with the nature, the nature of the offense and you’re on the same page with that?” and she ‘Tes.”
 

 In chambers, the defense counsel challenged Ms. Robertson-Shaw for cause, noting that the murder of her niece still affected her and that she had been on a jury that convicted a defendant of murder. The prosecutor responded that Ms. Robertson-Shaw had served on a jury in a drug case the week before that had acquitted a defendant. The court denied the challenge for cause.
 

 As with prospective juror King, Ms. Robertson-Shaw initially expressed hesitation when asked if the murder of her niece would cause her problems. Further questioning, however, elicited her responses that she would listen to the evidence to decide if the State met its burden of proving that the defendant murdered the victim and that she would not hold the murder of her niece against the appellant. She indicated that she thought that she could be impartial, even given the nature of the offense in the instant case. As such, her answers were sufficient for the trial court to deny the challenge for cause and we do not find that the ruling was error.
 

 
 *1201
 

 11(lAssignment of Error II
 

 The defendant, relying upon
 
 North Carolina v. Pearce,
 
 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), argues that the imposition of a more severe sentence after his second trial violated his constitutional right to due process. In
 
 Pearce,
 
 the Court held that although imposition of a harsher sentence after a second trial was not barred, vindictiveness or retaliation against a defendant who successfully attacked his first conviction was prohibited by due process. Thus, to avoid implication of such motivation, a trial judge who imposes a more severe sentence upon a defendant after a new trial must do so only for reasons “based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing” and “factual data upon which the increased sentence is based must be made part of the record, so that the constitutional legitimacy of the increased sentence may be fully review on appeal.”
 
 Pearce,
 
 395 U.S. at 726, 89 S.Ct. 2072;
 
 see also State v. Allen,
 
 446 So.2d 1200, 1202 (La.1984) (sentence vacated and remanded in absence of articulated reasons for the more severe sentence as required by Pearce).
 

 The Court clarified
 
 Pearce
 
 in subsequent cases. In
 
 Chaffin v. Stynchcombe,
 
 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714(1973), imposition of a greater sentence
 
 by a different jury
 
 after retrial was not a violation of the defendant’s due process rights because the second jury did not have a personal stake in the prior conviction and sentence and therefore vindictiveness could not be presumed. The court reasoned:
 

 Pearce
 
 was not written with a view to protecting against the mere possibility that, once the slate is wiped clean and the prosecution begins anew, a fresh sentence may be higher for some valid reason associated with the need for flexibility and discretion in the sentencing process. The possibility of a higher sentence was recognized and accepted as a legitimate concomitant of the retrial process.
 

 |11 Chaffin,
 
 412 U.S. at 25, 93 S.Ct. 1977. The Court also rejected the defendant’s argument that exposure to a greater sentence cast a chilling effect on his right to appeal because, to the contrary,
 
 Pearce
 
 “intimated no doubt about the constitutional validity of higher sentences in the absence of vindictiveness despite whatever incidental deterrent effect they might have on the right to appeal.”
 
 Chaffin,
 
 412 U.S. at 29, 93 S.Ct. 1977.
 

 The defendant in
 
 Texas v. McCullough,
 
 475 U.S. 134, 106 S.Ct. 976, 89 L.Ed.2d 104 (1986) elected to have the jury impose sentence after his first conviction but was subsequently granted a new trial. On retrial, the defendant was convicted of the same offense and, this time, elected to have the trial judge impose sentence. The trial judge imposed a greater sentence than that of the jury based in part on facts that had not been elicited in the first trial but also noting that, had he imposed the first sentence, it would have been a more severe sentence than that imposed by the jury. On review, the Court found that there could be no presumption of vindictiveness because the trial judge granted the defendant his new trial. Further, the defendant chose to be sentenced after his second conviction by the trial judge and, accordingly, a different entity imposed the second sentence. The Court cautioned, however that “[wjhere the prophylactic rule of
 
 Pearce
 
 does not apply, the defendant may still obtain relief if he can show actual vindictiveness upon resentencing.”
 
 McCullough,
 
 475 U.S. at 138, 106 S.Ct. 976.
 

 
 *1202
 
 Finally, the defendant in
 
 Alabama v. Smith,
 
 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989), received a sentence in exchange for a guilty plea that was successfully challenged and vacated, but after trial and conviction the trial judge imposed a harsher sentence. The Court under these circumstances determined that, even though the same judge imposed both sentences, the defendant’s due process rights were not violated because after a trial on the matter the judge necessarily had more | ^information on which to base his sentence. Accordingly, the case was remanded for consideration of the defendant’s claim that he could prove actual vindictiveness.
 

 In the case before this court, a different trial judge imposed the eighty-year sentence at issue. At the sentencing hearing, the trial judge heard the victim’s father testify at length about the impact of his son’s death on him and his family. He also read a letter from the victim’s only sibling. The decedent’s mother also testified as to the impact of her son’s death on her. Prior to imposing sentence, the trial judge reiterated that the sentencing range for manslaughter as a second offender is twenty to eighty years. The trial judge noted that the defendant had been a childhood friend of the victim and that he had shown no mercy to his victim, cutting, beating, and stomping the victim to death. Further, the trial judge observed that “probably the most troubling of facts” was the defendant and Johnson’s action in dumping the victim in the garbage. The trial judge found that the defendant showed no remorse and was in need of incarceration given the facts that he had been the victim’s friend since he was twelve years old and that his actions had been exceptionally cruel. In imposing sentence, the trial judge stated that it was her intention the defendant spend everyday of his sentence thinking about his crime against the victim. In response to defense counsel’s objective to the sentence as excessive, the trial judge noted that she had enumerated sufficient reasons to support the sentence, including the violence involved in the crime and the extent of the victim’s suffering before he died. Further, the trial judge stated that the maximum sentence was justified based on what she heard in the trial testimony, including the testimony concerning the victim’s injuries by the doctor who treated the victim at the hospital and the forensic pathologist who conducted |isthe autopsy, as well as the victim impact testimony from the family. In response to defense counsel’s argument that the defendant was exposed to a greater sentence because of his successful appeal, the trial judge accurately observed that appellate relief was based solely on the unavailability of the trial transcript, not on a substantive review of his prior conviction. In addition, the trial judge noted she had informed defense counsel prior to trial that, in the event the jury returned a verdict of guilty as charged and the defendant was adjudicated a second offender, she would impose a more severe sentence than the forty-five year sentence imposed by the first trial judge. Finally, the trial judge concluded that, given the facts of the case, the eighty-year sentence was appropriate.
 

 Because the transcript of the first trial is unavailable due to Hurricane Katrina, we cannot determine if additional information was adduced at the defendant’s second trial. However, in light of
 
 Chaffin,
 
 because different trial judges presided over the each of the defendant’s trials and the second trial judge had no personal stake in his prior conviction and sentence which was overturned because of the unavailability of pertinent transcripts, vindictiveness is not presumed. There is no evidence of any personal animus on the part of the trial judge against the defendant and, ac
 
 *1203
 
 cordingly, we interpret the trial judge’s remarks about her pre-trial intention to impose a greater sentence upon conviction to be an indication that she believed the first sentence was too lenient based on the egregious nature of this case. Finally, the sentence, although harsh, is based on clear and objective reasons enumerated on the record by the trial judge. Under these circumstances, we do not find that imposition of the maximum sentence constitutes a due process violation.
 

 11⅛Assignment of Error III
 

 Finally, the defendant argues that his eighty-year sentence, the maximum sentence under the law for a second offender convicted of manslaughter, is excessive.
 
 See
 
 La. Rev. Stat. 14:31; 15:529.1 A(1)(a). A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering.
 
 State v. Bonanno,
 
 384 So.2d 355, 357 (La.1980). A trial judge has broad discretion when imposing a sentence and, absent a manifest abuse of discretion, will not be set aside.
 
 State v. Cann,
 
 471 So.2d 701, 703 (La.1985). Upon review, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion.
 
 State v. Walker,
 
 00-3200, p. 2 (La.10/12/01), 799 So.2d 461, 462.
 

 Here, in compliance with La.Code Cr. Proc. art. 894.1, the trial judge clearly articulated adequate reasons for the sentence. An eighty-year sentence imposed on a second offender for manslaughter was upheld in
 
 State v. Walker,
 
 99-2868 (La.App. 4 Cir. 10/18/00), 772 So.2d 218, where the defendant strangled a woman after smoking crack and having sex with the victim because she allegedly began hitting and pushing him upon being informed that he had no more money or crack. In that case, the defendant’s prior conviction was for theft valued at more than five hundred dollars, but he also had a lengthy history of arrests, including seven prior arrests (but no convictions) for aggravated and/or assault offenses and family members expressed fear about the defendant’s character insofar as his ability to inflict bodily harm. Moreover, his defendant’s sister had reported to police in connection with another incident that he had a tendency to fight women |15 and had confessed to her that he killed his own grandmother. Prior to the legislative decision to raise the maximum sentence, this court upheld imposition of the maximum sentence on second offenders convicted for manslaughter.
 
 See, e.g., State v. Kelly,
 
 92-2446 (La.App. 4 Cir. 7/8/94), 639 So.2d 888 (defendant shot at one person whom he had tried to kill before and hit an innocent bystander);
 
 State v. Brown,
 
 452 So.2d 790 (La.App. 4 Cir.1984) (defendant had a running dispute with the victim over some jewelry, saw him in a bar, went outside to get and load a gun, returned to the bar, and shot the victim four times);
 
 see also State v. Mickey,
 
 604 So.2d 675 (La.App. 1 Cir.1993) (defendant shot the victim in the head during an armed robbery).
 

 Here, the defendant was one of two men who viciously beat and stomped the victim, fatally wounding him and then discarded him in a dumpster. Although there is no evidence that his prior criminal record was extensive as that of the defendant in
 
 Walker,
 
 the circumstances of the killing are unquestionably egregious. Under these circumstances, the imposition of the maximum sentence does not constitute an abuse of discretion.
 

 Errors Patent
 

 Our review of the record reveals no errors patent.
 

 
 *1204
 

 Conclusion
 

 The defendant’s conviction and sentence are affirmed.
 

 AFFIRMED.
 

 [1]
 

 . The State also indicted Jeremy Johnson for the same offense but the court ultimately severed the trials for Johnson and Kelson, and a jury found Johnson guilty of manslaughter. His appeal is also pending.