652 So.2d 1069 (1995)
STATE of Louisiana
v.
Lonnie JOHNSON.
No. 94-KA-1369.
Court of Appeal of Louisiana, Fourth Circuit.
March 16, 1995.
*1070 Harry F. Connick, Dist. Atty., Charmagne Padua, Asst. Dist. Atty., New Orleans, for plaintiff/appellee.
Dwight Doskey, Orleans Indigent Defender Program, New Orleans, for defendant/appellant.
Before SCHOTT, C.J., and ARMSTRONG and MURRAY, JJ.
ARMSTRONG, Judge.
Defendant, Lonnie Johnson, was indicted for aggravated rape, a violation of La.R.S. 14:42. Following the entry of a plea of not guilty, defendant was tried and convicted by a twelve-member jury. He was sentenced to the mandatory term of life imprisonment without benefit of probation, parole, or suspension of sentence. Defendant now appeals.

FACTS:
Shortly before Christmas 1991, a police officer investigating a report of a missing child was called to a barber shop in the 2700 block of Clara Street in New Orleans. There, he met with the missing child, A.R.[1], and his friend Chinester Robinson, whose father owned the barber shop. A.R., who was eleven years old at the time, told the police that he did not want to return to the home he shared with his mother, his siblings, and the defendant Lonnie Johnson because Johnson had hurt him. When A.R. showed the officer some old scars, the officer told him that because there was no evidence of any new injuries, he would have to return home. After A.R. had been put into the officer's car to be driven home, he told the officer that Johnson had anally raped him. A.R. was taken to the N.O.P.D. Child Abuse Unit where he was interviewed, and then he was taken to Charity Hospital where he was examined. As a result of the examination, it was learned that he had venereal warts ringing his anus. An expert in pediatric diseases, who examined A.R., testified at trial that it was unusual for an eleven-year-old child to have venereal warts on his anus in the absence of sexual activity with an infected person. The doctor also testified that a person infected with warts could be a carrier who had no outward manifestation of the infection. A.R.'s mother and the defendant were subsequently arrested in connection with these crimes.
A.R. testified that in April 1991, he was living in an apartment with his mother, his two sisters, his brother, and the defendant, who was his mother's boyfriend. He testified *1071 that one night, when the others were asleep, the defendant came into his room, awakened him, and took him into the living room. The defendant told A.R. to bend over, put a sock in A.R.'s mouth, and then anally penetrated A.R. A.R. testified that the defendant threatened to kill A.R.'s mother and siblings if he said anything about the incident. A.R. testified that the defendant repeated these acts approximately three times a week, sometimes committing them in the bathroom, and that sometimes the defendant would hit him with an extension cord if he yelled too loud when it hurt. A.R. testified that in June 1991, he ran away from home and spent the summer with his friend Chinester Robinson and her family. When he returned to his mother's apartment at the end of the summer, the abuse began again. He testified he ran away from home in December 1991 and again went to Ms. Robinson's home. At Ms. Robinson's insistence, he called the police and met them at her father's barber shop, where Ms. Robinson worked and where A.R. worked part time after school. A.R. testified that he was hospitalized at Eastlake Hospital in February 1992 when he tried to commit suicide.
A.R. testified that he did not tell anyone about the abuse, including Ms. Robinson or his mother, due to the defendant's threats. He indicated he did not think his mother would believe that the defendant had abused him. He admitted that he and the defendant did not get along well, that the defendant corrected and spanked him, and that he ran away in December because he was going to be spanked for some reason. He also testified that he did not know that the police would arrest his mother concerning the abuse, and he stated that soon after his mother was arrested, he had a breakdown. He also testified that his mother was still in jail.
Chinester Robinson testified that A.R. worked for her in her father's barber shop, sweeping up after school. She testified that in June 1991, when A.R. first ran away, the defendant came to the shop and accused her of keeping A.R. She testified that when she went home that night to her house in Gentilly, after looking various places for A.R., she found him at her house with her two children. She testified that after she returned him to his house, kicking and screaming, the defendant agreed to allow A.R. to stay with her during the summer. A.R. remained with her until school started in August, and she testified that during his stay neither A.R.'s mother nor the defendant called to see how he was doing.
Ms. Robinson testified that when A.R. ran away in December, the defendant again confronted her the next morning at her shop. She testified that she received a call from her children saying that A.R. had appeared at her home, having walked there from his uptown home. She testified she went home, picked him up, and took him to the shop, where she insisted he notify the police of his whereabouts. She testified that she did not try to take him back home because he insisted he did not want to go there. She testified that although he never told her about the abuse, she suspected something may have been going on at his house, but she did not want to press him about it because she did not want to scare him away from her. She testified that A.R. always wore dirty clothes. She testified that she took him to Charity for his exam in December 1991, and she took him to Eastlake in February 1992, when he attempted suicide. She denied that she had caused his suicide attempt by failing to buy as many presents for him as she did for her children. She testified that A.R. lived with her until July 1992.
A.R.'s grandmother testified that he came to live with her in July 1992. She testified that A.R. had grown and put on weight while living with her, and she indicated he had never tried to run away while living there. She testified that she did not have much contact with A.R. while he was living with his mother and the defendant in 1991, but she visited him quite often when he was living with Ms. Robinson.
Officer Elizabeth Bateman of the New Orleans Police Department's Child Abuse Division testified that she interviewed A.R. in December 1991. She testified that A.R. appeared to be sad and scared, that he was dirty and malnourished, and that he kept squirming in his chair. She testified she *1072 took photographs of scars on A.R.'s back, legs, arms, and buttocks. She testified that she interviewed A.R.'s mother, and she interviewed the defendant after he had signed a waiver form. She testified that the defendant told her he had threatened to hit A.R. for leaving the house late at night, but the defendant denied the sexual abuse.
Dr. Alfred Olinde, qualified as an expert in psychiatry, testified that he treated A.R. at Eastlake Hospital in February 1992 after A.R. had taken an overdose of ringworm medicine. He testified that A.R. was treated for ringworms and for venereal anal warts while he was there. He testified that A.R. had exhibited many characteristics of a child who had been sexually abused, including depression, distancing from males, and a general lack of resistance. In addition, A.R. scratched his thighs and head until he bled, and Dr. Olinde testified that he had only seen this in children who had been sexually abused. Dr. Olinde testified that although A.R. told him he had tried to commit suicide because Ms. Robinson did not buy him as many birthday presents as she bought for her children, he theorized that the suicide attempt was the result of sexual abuse. Dr. Olinde admitted that many times there is resentment on the part of a son when another male enters a family. However, because of the presence of the anal warts and A.R.'s self-inflicted wounds, Dr. Olinde did not believe that A.R.'s claim of sexual abuse was in retaliation for any resentment he may have had when the defendant started living with his family. Dr. Olinde testified that A.R. never told him he was depressed because his mother had been put in jail; he only told Dr. Olinde that he was angry at her because she would not intercede on his behalf.
Dr. Katherine Coffman, who was qualified as an expert in child sexual abuse and communicable diseases, testified that a lack of evidence of anal trauma during a rape examination is usual because of the elasticity of a child's anus, which heals quickly. She testified that although she did not examine either A.R. or his mother, she examined their medical records. She indicated that A.R. had venereal warts covering his anus, and she testified that warts are a sign of trauma and that anal warts in older children are most likely to occur through sexual contact. She testified that A.R.'s mother had wartytype cervical dysplasia (abnormal cells in her cervix) in 1990, and she indicated that the most common cause of cervical dysplasia is warts, although this is not the only cause. She said that it was unlikely that a mother with genital warts could infect her son with anal warts. Dr. Coffman further testified that the mother's boyfriend might not have warts, but could be a carrier for the warts, as the infection is transmitted by cell to cell contact through the shedding of skin cells, and if the carrier had the infection in his cells, he could pass the infection. She said that the wart virus could then infect traumatized areas.
The defense presented evidence from a staff nurse with the Sheriff's Office that the defendant had been free of any diseases since he was booked. She testified that all prisoners are examined once a year, and the defendant had never complained of any illness.
E.R., A.R.'s mother, testified that the defendant started living with her four years before his arrest. She testified that A.R. is her oldest child, that she has a daughter who is A.R.'s half-sister, and a son and daughter by the defendant who are also A.R.'s halfsiblings. She denied ever having genital warts. She testified that she gave A.R. permission to stay with Ms. Robinson, and she insisted that she and Ms. Robinson never argued about the amount of time A.R. spent with Ms. Robinson, although Ms. Robinson occasionally told her that A.R. belonged to her (Ms. Robinson). E.R. insisted that she never saw the defendant get any of her children out of bed, that neither A.R. nor her other children ever told her about any abuse by the defendant, and that she never suspected that the defendant abused her children. She denied that A.R. and the defendant fought, insisting that they got along well. She also denied that A.R. was returned screaming and kicking to her house by Ms. Robinson. She denied calling Ms. Robinson or her father in December when A.R. ran away from home, and she maintained that the first she learned of the abuse *1073 was when she appeared at the police station to pick up A.R. and was arrested instead. She admitted that in April 1991 she pled guilty to two counts of cruelty to juveniles for beating A.R. and his sister.

ERRORS PATENT:
A review of the record for errors patent reveals there are none.

ASSIGNMENT OF ERROR:
By his sole assignment of error, the appellant contends that the trial court erred by allowing two expert witnesses to testify as to an ultimate issue. Specifically, he refers to the testimony of Dr. Olinde as to the characteristics associated with a child who has been abused and to the testimony of Dr. Coffman as to an explanation for a lack of trauma seen during a rape examination of a child and as to her examination of the victim's and his mother's medical records, the presence of warts in both, and the unlikelihood that the victim's mother could have passed the warts to him.
Both witnesses were qualified as expert witnesses. Art. 702 of the Louisiana Code of Evidence provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
In addition, art. 704 provides:
Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact. However, in a criminal case, an expert witness shall not express an opinion as to the guilt or innocence of the accused.
Prior to the testimony of both doctors, a discussion was had as to the use of the medical records of the victim's mother. After debating the legality of the State's possession of the records, the following then occurred:
BY MR. MEYER [DEFENSE ATTORNEY]:
Here's what I want to put on the record, Judge. I'm going to object to any witness taking the stand, and especially Dr. Coffman taking the stand, and telling this jury in anyway [sic] whatsoever that she believes a rape occurred and that this man committed it and that anybody is telling the truth or not telling the truth.
BY THE COURT:
We're finally getting into things that are meaningful, in my opinion. Did you hear what he said, Mr. Billeaud [A.D.A.]?
BY MR. BILLEAUD: He doesn't want Dr. Coffman to get up and testify to anything that could possibly corroborate the victim's testimony.
BY THE COURT:
No, I don't thinkif that's what he said, then
BY MR. MEYER:
If she can do that,
BY THE COURT:
The doctor cannot say in their [sic] expert opinion that the victim is telling the truth or a non-truth.
BY MR. BILLEAUD:
You're right.
BY THE COURT:
Thank you, Mr. Billeaud.
During the testimony of Dr. Olinde concerning his treatment of the victim at Eastlake Hospital, the prosecutor asked him if "during that time, did [the victim] display any behavior that would be characteristic of a sexually abused victim?" The defense counsel objected, noting that "[t]hat is a jury decision and is not a decision for an expert to make." The court then asked Dr. Olinde: "In your field of expertise, is there a normal situation the way certain people act after certain things like sexual trauma happen to them?" Dr. Olinde then replied:
Yes, certainly. Certainly depression is a very common thing that follows sexual abuse. Certainly the distancing from males which we did observe. He did not want to talk to males hardly at all and would do anything possible to get away and get out of talking to them. He, however, was overly complied in the fact *1074 that he would never tell you no or resist directly. He pictured himself as a victim more often in some of the psychotherapeutic play that we did. I guess most importantly that would make me know that he was victim of sexual abuse is that he would scratch his thighs and his scalp to the point that he would make himself bleed. And whenever you see this, when you see blood in a person who inflicts this on himself, this is an indicator of sexual abuse usually. You just don't see this with anything else except sexual abuse.
Dr. Coffman testified that she rarely finds evidence of trauma when conducting a rape examination of a child. She testified that many times the child has not experienced sufficient physical trauma that would cause a scar in healing. She also indicated that seldom is a child examined soon after the alleged abuse. In addition, she testified that a child's anus is quite elastic, and minor tears will heal quickly with no scarring. She testified: "The only time I expect to see anything abnormal unless it's within twelve hours after the event is if there's been such forceful penetration, and this is exceedingly rare and usually only with very young children, that it tears actually down through the muscle fibers and then you see abnormality. But it's quite uncommon." Dr. Coffman testified as to different types of warts, including venereal warts, and how they are transmitted. She indicated that venereal warts could be passed at birth from an infected mother to a child through the birth canal, but the warts would manifest themselves no later than two years after birth. She also testified that venereal warts on the anus of an eleven-year-old child would most likely be the result of sexual conduct. When the prosecutor asked Dr. Coffman if she had examined the medical records of the victim and his mother, the defense attorney objected on privacy grounds, and his objection was overruled. In response to the prosecutor's questions, Dr. Coffman testified that the lack of trauma noted at the time of the examination did not rule out sexual abuse. She also testified that she had examined the victim's mother's medical records and had discovered that she had been diagnosed with cervical dysplasia of a warty type a year and a half prior to the victim's examination. The prosecutor then asked:
O.K. And is that significantlet me ask you a hypothetical question. In a situation where a child who is alleging sexual abuse is examined and has anal warts and his mother's medical records are researched and it is learned that a year and a half before she has cervical warts, cervical dysplasia. And the allegation is that the mother's boyfriend is the perpetrator. Does that make scientific sense to you?
BY MR. MEYER:
Judge, please.
BY MR. BILLEAUD:
I'm not a doctor.
BY MR. MEYER:
I'm objecting again. I mean we can excuse these people and maybe let the doctor find him guilty.
BY THE COURT:
Well, now doctor, I mean counselor, counselor, you're testifying. All right?
BY MR. MEYER:
So is she.
BY THE COURT:
And she's under oath; you're not. All right? She's an expert witness. He can give hypotheticals no matter how cumbersome they are. And I'm going to overrule your objection.
EXAMINATION RESUMED BY MR. BILLEAUD:
Q. Does that make sense to you, doctor, that a child of a woman who has cervical dysplasia and the child has anal warts and he's alleging sexual abuse by the mother's boyfriend, does that make sense to you?
A. Yes, it would be a route of transmission.
In response to further questioning, Dr. Coffman ruled out the possibility that the child could have gotten the warts from a toilet seat. She also testified that a carrier of the warts need not actually have warts in order to spread the virus to others.
The appellant now argues that the trial court erred by allowing this testimony because it bore on an ultimate issue to be *1075 decided by the jury, whether sexual abuse had occurred. As noted above, however, La. C.E. art. 704 permits an expert to express an opinion which embraces an ultimate issue to be decided by the trier of fact.
The appellant cites State v. Foret, 628 So.2d 1116 (La.1993) as support for his position that the testimony of both Dr. Olinde and Dr. Coffman was improper. In Foret, the defendant was charged with molestation of a juvenile. The defense presented witnesses who testified that the victim had recanted her accusation. In response, the State presented two expert witnesses. One was the victim's physician, who testified, as did Dr. Coffman in this case, that the lack of positive physical evidence gleaned from a physical examination of the victim was not unusual in that type of case. The State also presented the victim's psychologist who testified as to the characteristics of Child Sexual Abuse Accommodation Syndrome (CSAAS), which included a recanting phase which occurs when a victim has been separated from her family due to the allegations of abuse in her home. When asked by the prosecutor if in his opinion the victim had been sexually abused, the psychologist responded that her behavior was consistent with the "dynamics" of sexual abuse and that therefore he concluded that she had been sexually abused.
On appeal, the issue before the Court was whether the trial court erred by allowing the introduction of this evidence when the State waited until the morning of trial to inform the defense about the psychologist's report and of its intention to have the psychologist testify. In its opinion, however, the Court considered the actual propriety of allowing the doctor to testify concerning CSAAS and to render an expert opinion based upon the principles of CSAAS. In determining whether the psychologist's testimony would qualify as an expert opinion under La.C.E. art. 702, the Court adopted the test set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., ___ U.S. ___, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), "which set forth a means for determining reliability of expert scientific testimony and answered many questions as to proper standards for admissibility of expert testimony." Foret, 628 So.2d at 1121. The Court further stated:
The court replaced [the "general acceptance" test of] Frye [v. United States, 54 App.D.C. 46, 293 F. 1013 (1923)] with a new standard that requires the trial court to act in a "gatekeeping" function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. This requirement stems from a belief that the rules on expert testimony serve to relax "the usual requirement of first-hand knowledge" to ensure reliability on the part of a witness. [___] U.S. at [___], 113 S.Ct. at 2796. This relaxation is justified so long as "the expert's opinion (has) a reliable basis in the knowledge and experience of his discipline." Id.

The reliability of expert testimony is to be ensured by a requirement that there be "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Id. This connection is to be examined in light of "a preliminary assessment" by the trial court "of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." Id. The court went on to make some suggestions as to how a court could fulfill its gatekeeping role. These involve whether or not the technique had been subjected to peer review and/or publication, the "known or potential rate of error", the existence of "standards controlling the technique's operation", the technique's "refutability" or, more simply put, testability, and, finally, an incorporation of the Frye general acceptance in the scientific community as only a factor in the analysis. [___] U.S. at [___], 113 S.Ct. at 2797.
The court also stated that other rules of evidence govern this testimony, mainly F.R.E. 403's balancing test that will exclude probative evidence if outweighed by its potential for unfair prejudice. [footnote omitted] The Court noted the possibility that the expert's testimony can be quite misleading and prejudicial if this gatekeeping role is not properly satisfied, requiring a flexible approach and a careful evaluation *1076 of the methodology surrounding the testimony and its conclusions:
Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final, and binding legal judgmentoften of great consequence about a particular set of events in the past. We recognize that in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes.
Id., ___ U.S. at ___, 113 S.Ct. at 2798.
Foret, 628 So.2d at 1122.
The Court held that in order to qualify as expert testimony admissible under art. 702, the testimony must "rise to a threshold level of reliability" as per Daubert. Foret, 628 So.2d at 1123. Using the Daubert criteria, the Court discussed at length the failure of the psychologist's testimony concerning CSAAS to satisfy the requirements of admissibility. The Court noted that one problem with this sort of testimony was that the "dynamics" of CSAAS were intended for treatment purposes once instances of sexual abuse had been established, not for the purpose of determining whether the abuse had occurred. Despite this, CSAAS testimony was consistently used by prosecutors to bolster the credibility of the victim that abuse had occurred. The Court also noted the lack of general acceptability of CSAAS factors, the impossibility to "test" the reliability of these factors, and the relatively high "known or potential rate of error" associated with CSAAS factors.
The Court also addressed the actual "helpfulness" of CSAAS testimony to the jury in its determination of a victim's credibility, quoting from cases from various other jurisdictions which had uniformly disallowed expert testimony concerning opinions as to sexual abuse victims' credibility because such testimony would invite the jury to abdicate its responsibility to determine if the victim was truthful. The Court stated:
Courts have also been concerned with unfair prejudice to the defendant from this type of expert testimony. Prejudice can result from the testimony's giving "factfinder[s]... little more than a false sense of security based on the incorrect assumption that a reasonably accurate scientific explanation [for behavior] has been provided." Morse[2], supra, at 1026. This testimony on credibility has the effect of "putting an impressively qualified expert's stamp of truthfulness" on a witness' testimony. Azure[3], supra, at 340. This "stamp" has the effect of "so bolstering a witness' testimony... [as to] artificially increase its probative strength with the jury and ... its admission may in some situations on this basis constitute reversible error." Homan v. United States, 279 F.2d 767, 772 (8th Cir.), cert. denied, 364 U.S. 866, 81 S.Ct. 110, 5 L.Ed.2d 88 (1960).
This bolstering of credibility has the effect of unfairly prejudicing a criminal defendant, and, as such, the use of CSAAS-based testimony for the purpose of bolstering a witness' credibility creates a risk of prejudice that outweighs its questionable probative value. Given the near unanimity of other jurisdictions' disapproval of CSAAS-based testimony as a determinant of abuse, coupled with our observations of the risk of prejudice inherent in CSAAS, this court now concludes that such opinion testimony as a determinant of a victim/witness' credibility is not admissible.
Foret, 628 So.2d at 1129.[4]
The Court did not entirely rule out the use of CSAAS evidence and theorized it might be used in a limited way to rebut *1077 attacks on the victim's credibility.[5] However, the Court stated:
In the instant case, the expert testified as to his expert opinion on the victim's credibility, and did not limit his testimony to general information about possible psychiatric explanations for the delay in reporting. In fact, the expert based most of his opinion upon the "level of detail" of the child's description of the sexual abuse. He concluded with an objected-to summation that, in his expert opinion, the witness was telling the truth on that occasion as to whether abuse had occurred. This expert assessment of the witness' credibility was improper, making the trial court's overruling of the objection erroneous.
Foret, 628 So.2d at 1130.
Here, most of Dr. Coffman's testimony of which the appellant complains on appeal was not objected to at trial. The defense raised no objections during Dr. Coffman's testimony concerning the reasons for the lack of physical evidence of abuse, or during her general testimony concerning venereal warts, a mother's ability to pass them to her child at birth, and the unlikelihood that an older child would get anal venereal warts from its mother. As such, error as to them cannot now be raised on appeal. See La.C.Cr.P. art. 841. Although there was an initial objection to Dr. Coffman's testimony from the victim's mother's medical records, this objection was based upon her privacy interest. Defense counsel also objected to Dr. Coffman's qualification in the area of "sexual abuse", but he does not argue this objection on appeal. The same privacy objection was raised and overruled when Dr. Coffman was questioned as to whether she had reviewed the victim's mother's medical records. This court has held that a new basis for an objection cannot be raised for the first time on appeal. State v. Straughter, 630 So.2d 884 (La.App. 4th Cir.1993); State v. Berryhill, 562 So.2d 1105 (La.App. 4th Cir.1990). His objection to the State's question about the "percentage" of sexual abuse victims exhibiting no physical evidence of trauma was sustained.
Thus, the only testimony of Dr. Coffman which is properly before this court in connection with this assignment is her testimony in response to the prosecutor's question concerning whether it made sense that a mother with cervical warts would have a child with anal warts who alleges sexual abuse by the mother's boyfriend. Dr. Coffman's sole testimony in response to this question was that the boyfriend would be a "route of transmission" because the mother could not physically pass the warts to the child.
Contrary to the appellant's assertions, this testimony does not appear to be the kind of testimony disallowed in Foret. It did not involve the type of opinion testimony disallowed in that case, nor was her testimony a comment on the victim's credibility. Dr. Coffman merely testified as to the possibility that the boyfriend of a mother infected with cervical warts could pass the warts to the mother's son through sexual activity and as to the impossibility of the mother to pass the warts directly to the son. As such, it appears that this evidence was properly admitted. In addition, even if this testimony were inadmissible, it appears that such error would be harmless in this case. Although such evidence established a possible link between the victim's warts and those of his mother through the appellant, the State could not establish that the defendant ever had venereal warts or even that he was a carrier of them. As such, it does not appear that Dr. Coffman's testimony, if erroneous, contributed to the verdict and thus affected the appellant's substantial rights. La. C.Cr.P. art. 921; Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Foret, 628 So.2d at 1130-1131.
We now consider the objected-to testimony of Dr. Olinde. Although there was no separate objection by the defense after the disputed testimony quoted above, defense counsel had objected just prior to this testimony when the prosecutor asked Dr. Olinde if the victim had displayed any behavior *1078 which was characteristic of a victim of sexual abuse. Although the court did not specifically overrule the objection, it asked a similar question which elicited the response which forms the basis of the appellant's claim on appeal. Thus, the earlier objection appears to have preserved this issue for review.
As to Dr. Olinde's testimony concerning the attributes of a child who has been sexually abused, it was not precisely that disallowed by the Court in Foret. First, the "factors" recited by Dr. Olinde were not exactly the same "dynamics" disallowed in Foret. Dr. Olinde's statement: "I guess most importantly that would make me know that he was a victim of sexual abuse is that he would scratch his thighs and his scalp to the point that he would make himself bleed. And whenever you see this, this is an indicator of sexual abuse usually. You just don't see this with anything else except sexual abuse," was not necessarily a comment on the victim's credibility on the issue of whether he had been abused. However, even assuming that this comment would fall under Foret, we find that allowing Dr. Olinde to make this comment was harmless error when considered in light of all of the evidence, particularly the presence of the venereal warts around A.R.'s anus, the medical testimony establishing the probability that he got those from sexual contact and that his mother, with whom it can be presumed defendant had engaged in sexual relations, had a condition, one cause of which was venereal warts. We find that, beyond a reasonable doubt, that the above comment by Dr. Olinde did not contribute to the jury's verdict. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
For the foregoing reasons, we affirm the defendant's conviction and sentence.
AFFIRMED.
MURRAY, J., concurs with reasons.
MURRAY, Judge, concurring with reasons:
I concur in the judgment and the analysis of the opinion as to the testimony of Dr. Coffman.
As to testimony of Dr. Olinde I agree that the objected to testimony was harmless error under the facts of this case. However, I do not agree that Dr. Olinde's testimony was not a comment upon the victim's credibility.
The trial court, apparently in an effort to exercise its "gatekeeper" duty as set forth in Foret, asked the expert if there were certain actions that were common in cases of sexual abuse. Dr. Olinde testified as to certain behaviors common to these cases. He then, without being asked to do so, applied these common behaviors to A.R., the victim in this case. He concluded by describing one particular behavior of A.R. and stated, "You just don't see this with anything else except sexual abuse."
Like the expert testimony in Foret, this testimony by Dr. Olinde would lead the jury to conclude that it was scientifically impossible for A.R. not to have been abused. For all the reasons discussed by the Supreme Court in Foret, this was error. However, because of the substantial evidence supporting the jury's conclusion that A.R. was abused and that the defendant was the abuser, the error, in this case, was harmless.
NOTES
[1] Due to the nature of the offense and the age of the victim, only his initials will be used in the court's opinion.
[2] Morse, "Failed Explanations and Criminal Responsibility: Experts and the Unconscious", 68 Va.L.Rev. 971 (1982).
[3] United States v. Azure, 801 F.2d 336 (8th Cir. 1986).
[4] See also La.C.E. 403, which provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."
[5] Indeed, the Court has since used CSAAS factors pertaining to delayed reporting of sexual abuse in its determination of whether a tort suit arising out of sexual molestation of a juvenile had prescribed. Wimberly v. Gatch, 93-2361 (La. 4/11/94), 635 So.2d 206.