782 So.2d 52 (2001)
STATE of Louisiana
v.
Francis BRAUNER.
No. 99-KA-1954.
Court of Appeal of Louisiana, Fourth Circuit.
February 21, 2001.
Rehearing Denied March 30, 2001.
*56 Harry F. Connick, District Attorney, Susan Erlanger Talbot, Assistant District Attorney, New Orleans, LA, Counsel for Plaintiff/Appellee.
Marcia A. Widder, Richard C. Teissier, New Orleans, LA, Counsel for Defendant/Appellant.
Court composed of Judge BAGNERIS, Judge KIRBY, and Judge GORBATY.
BAGNERIS, Judge.

STATEMENT OF THE CASE
By grand jury indictment dated January 8, 1998, defendant was charged with one count of aggravated rape, one count of forcible rape, and one count of aggravated crime against nature. He pleaded not guilty; and, on November 30, 1998, a twelve-member jury that found him guilty of forcible rape on the aggravated rape count and guilty as charged on the other two counts tried him. On May 3, 1999, defendant filed a motion for new trial that was denied by the trial court; and, the trial court sentenced defendant to forty years at hard labor without benefit of parole, probation, or suspension of sentence on the two forcible rape convictions and to fifteen years at hard labor without benefit of parole, probation, or suspension of sentence on the aggravated crime against nature count. The sentences were to run concurrently with each other. The trial court denied defendant's motion for reconsideration of sentence.

STATEMENT OF THE FACTS
Detective Pearla Gibbs testified that on April 14, 1997, she was assigned to investigate a report of rape received via an anonymous phone call. She stated that she had received a phone call from a woman who said that her daughter had told her that the daughter's good friend had been raped. Detective Gibbs further stated that she got the names of the parties involved from the caller, whom she identified as Patty Partland. Detective Gibbs testified that before she and a worker from Child Protection went to Ms. Partland's house, she called the victim, who told Gibbs that her mother was at work and that her stepfather, who was the accused, was at a funeral. Gibbs interviewed Ms. Partland and then went to the victim's home. She stated that the victim's mother *57 met her at the door and that she heard a male voice saying, "Just telling truth." Gibbs further stated that she then saw defendant with his arm around the victim, who was crying. She ordered them to separate; and, Miss Guise, the worker from Child Protection, took the victim to the side while Gibbs sat with defendant and his wife in the kitchen to explain why she was there. Gibbs then went to speak with the victim who was upset and crying. The victim told Gibbs that she did not want defendant to go to jail and that she did not want to cause trouble between him and her mother. After interviewing the victim, Gibbs read defendant his rights and placed him under arrest.
Dr. Khouri Anas testified that on April 29, 1997, she examined the victim, who was thirteen years old. She further testified that the victim told her that the last incident of sexual abuse had been a month earlier and that there had been several other incidents of vaginal penetration as well as anal penetration. Dr. Anas testified that her examination showed that the victim's hymen was still present and that it was thickened, irregular, and redundant, which she said was the type adolescents mainly had. She stated that because of the secretion of puberty hormones, the hymen grows and makes what she described as a cauliflower shape and which she called redundant. She also stated that the opening in the victim's hymen was within normal limits. Dr. Anas testified that because the hymen is elastic, she could not tell just from the examination if it had been traumatized. She also found that the victim's rectal area was normal.
Dr. Susanne Tropez-Sims was qualified as an expert in child sexual abuse, and she testified that there was a scale, which went from one to five, called Tanner Development to determine a child's genital development. She stated that the victim was a Tanner Four, which meant that she would have the effects of estrogen thickening her vagina and causing her hymenal tissue to have a paler appearance. The victim would also have a thin, milky discharge, called leukorrhea, and pubic hair over her genital area. Dr. Tropez-Sims reviewed the victim's colposcope photographs, and she described the victim's hymen as a denticular hymen, which went all the way around, and that it was estrogenized. She stated that the victim's hymen had a lot of folds or extra skin and that a denticular hymen would show fewer signs of injury than would a crescentic hymen. She further stated that because of the extra folds, it might allow more penetration although it can also tear. When asked about the healing powers of an estrogenized hymen, Dr. Tropez-Sims replied that whether it is estrogenized or not, the genital area heals within forty-eight hours unless there are really deep tears. She also stated that the rectum heals very fast and that if there is a delay in reporting, there would be no physical findings.
Patty Partland testified that her daughter Meredith was a good friend with the victim and that on April 13, 1997, Meredith told her something that concerned her. Ms. Partland further testified that she then called a crisis hotline to report that a child was being sexually abused. She said that she was given another number to call which she did the next morning and was asked to take the victim to the NOPD at 3:30 p.m.; but, at 11:30 a.m., a police officer, Al Hines, came to her house to ask about another neighbor who was going to be a police officer. Ms. Partland said that she spoke to Hines about the neighbor and that she also told him about what Meredith had told her. She stated that she and Meredith spoke on the telephone to Detective Gibbs around 12:30 or 1:00 p.m. She again arranged to take the victim to the police at 3:30, but Gibbs called her back to *58 find out where the victim went to school and the time she got out of school. When she told Gibbs that the victim got out at 1:50, Gibbs told Ms. Partland that she would come out to get the victim. Ms. Partland stated that between the two phone calls with Detective Gibbs, she got a call from the victim, who said that she had received a phone call that the police were on their way because it had been reported that she had been sexually molested. Ms. Partland further stated that the victim was crying and said that defendant was going to hurt her. She said that she then heard the victim's mother come into the room and start screaming at the victim. She also heard the phone beeping, and she said that the victim told her that it was the defendant calling. The victim again stated that defendant was going to hurt her, and Ms. Partland heard the phone beep again. The victim told her that it was defendant screaming at her not to tell. Ms. Partland saw defendant drive into the neighborhood, park his truck, and run into his house. She saw him come back out to his truck and then go back into his house. Ms. Partland saw the police arrive, and she directed them to defendant's house when they appeared to be lost. She testified that Meredith had told her that the victim was being molested and that defendant would make the victim dance for him while he put money in her underwear. Ms. Partland also testified that Meredith said that the victim told her that she and defendant had had sexual and oral intercourse several times. She stated that two weeks after defendant's arrest, Meredith told her that defendant had tried to get her to change clothes and tried to "do something" to her.
Meredith Partland testified about telling her mother what she had been told by the victim about being molested by defendant. She stated that when Officer Hines came by her house to ask about the neighbor who was to be police officer, she told him what she had been told by the victim. She said that she then spoke on the phone with Detective Gibbs about the matter. Meredith testified that when the victim came home from school, the victim called her and that she then went over to the victim's to get some makeup she had left there. Meredith said that she only stayed a couple of minutes and that the victim and her baby brother were the only ones there. After she returned home, Meredith got a phone call from the victim who asked her who had reported that defendant had been molesting her. Meredith said that she did not say anything and handed the phone to her mother. Meredith testified that when the victim had told her about the molestation, the victim asked her not to tell anybody because she did not want anything to happen to her little brother and her mother and that she knew defendant would be very upset and mad at her. Meredith said that she decided to tell her mother about it because she knew it was wrong and that the victim would be living in misery until she would be able to move out. She also stated that the victim told her about it on April 3 when she was staying at the victim's house along with another girl named Ashley. She said that Ashley left before it got dark and that the victim told her that defendant needed to talk to them about something. Meredith and the victim sat in the living room where defendant told them to be careful around boys and sometimes that the only thing they wanted was sex. Meredith testified that defendant then told them that they needed lessons from a "real man" and that he told her not to tell her father. He asked who wanted to go first, and Meredith told him that she would. He told her that the first lesson would be "lickety-split" and that she and the victim were to go to the victim's room, takes off all their clothes, and put on white *59 T-shirts. Meredith testified that she told defendant that she was comfortable as she was and that she and the victim went to the victim's room where the victim proceeded to tell her what had been going on. She said that because the victim's mother then came home from work, she felt comfortable in staying overnight. Meredith testified that the victim told her that defendant would lick her breasts and vaginal area and that he had been doing that since she was eight years old. She further testified that the victim told her that while living in a blue house on an island, defendant would have her model in her panties and that he would put money in her panties. Meredith stated that the victim also told her that defendant had had sex with her at a camp owned by Ronnie Bodenheimer, at a brown and white house where she lived for a while, and at two different apartments the family lived in after the brown and white house burned down. She also told Meredith that defendant had used a condom a couple of times and that he would ejaculate into a face rag.
On cross-examination, Meredith testified that she asked the victim what "licketysplit" meant and that the victim told that it was when "a man licks your vaginal area." Meredith further testified that she asked the victim why defendant asked her to do that and that the victim replied that he was always doing that her. She said that she waited ten days to tell her mother because she did not know what to do.
The victim testified that her birth date was March 19, 1984, and that she first met defendant when she was seven years old. She further testified that after her mother married defendant, they lived in her grandmother's house on an island near Venetian Isles. She said that they then moved to a blue house on the island and that while they lived there, defendant had her model for him. She also said that defendant had her take off her shirt while she modeled and that he put money in her underwear. She stated that defendant told her that he wanted her to be a stripper when she got older. The victim testified that defendant had also gotten into the shower with her and started bathing her. She said that he asked her to bathe his private parts, but she refused to do so but did wash his back and front. She also said that he told her not to tell her mother because he did not want anything to happen between them. The victim testified that two or three weeks after this incident, defendant took her to Ronnie Bodenheimer's camp which was eight or nine houses down from the blue house. She said that he told her was going there to get a fishing pole and that he took her into a back room where there was a bed. She stated that he told her to take off her clothes, but she only removed her pants. He made her lie on the bed and then placed his mouth on her breasts and vagina. She stated that he then put his penis in her vagina. She told him that it hurt and asked him to stop, which he did. She testified that nothing more happened for some time and that her family moved out of the blue house and into a beige and white house across from the marina. She further testified that after they moved into the new house, defendant told her to stay home from school and watch her newborn baby brother while her mother drove her older brother to school. She stated that defendant came into the bedroom where she was watching the baby and that he started rubbing on her private parts. She said that he then pulled down her panties and put his penis in her vagina. She said that he did the same thing to her in her brother's bedroom where he would look out of the window to see if her mother or anyone else was coming from the marina. She stated that defendant also had anal sex with her, but he stopped when she told *60 him it hurt her. The victim testified that they lived in that house until it burned, which she believed happened when she was eleven years old. She said that they moved into an apartment and that there was a mattress on the living room floor because it would not fit up the stairs. The victim stated that defendant would make her watch porn films on television and that he told she would be like one of those people. She stated that while she was on the mattress, he would kiss her breasts, rub on her, and put his penis in her. She stated that they then moved to another apartment and that when she had her first period, defendant had taken her upstairs to his bedroom where they had sex. She said that afterwards, defendant looked at his penis and told her get into the tub because she had started her period.
The victim testified that just before her birthday in 1997, her mother and defendant were at the marina while she babysat her brother. She stated that she had been sleeping on the sofa when defendant came in and starting "feeling on" her. She stated that she told defendant to get off of her, but he took her and put her in her bed where he removed her jeans. She further stated that he pulled her to the end of the bed but she scooted away in order to get him to leave her alone. She said that he smelled of alcohol and that he kept trying to get his penis inside her but could not. She said that he finally left her room. The victim told of another incident in which defendant asked to see her breasts; and, when she refused, he told her that he would leave her alone if she showed them to him. She showed him her breasts and then went to her room.
The victim also testified about the circumstances surrounding the night she told Meredith what had been happening. She said that she, Meredith, and Ashley had been in her room listening to the radio and playing Nintendo when defendant told her it was time for Ashley to go home. She walked Ashley to the corner and returned home where defendant called her and Meredith into the living room. She testified that defendant said that her mother wanted him to talk to them about boys in the neighborhood and why he did not want her to have a boyfriend. She said that defendant told her and Meredith that the boys in the neighborhood had AIDS and then looked at Meredith's feet. She said that he asked her if she remembered when her feet were as small as Meredith's and then said that he wanted to teach them a lesson. He told them that the first lesson would be "lickety-split" and asked to go put on white T-shirts with nothing underneath.
The victim said that Meredith told defendant that she was comfortable as she was and that they both then went to her bedroom. The victim locked the door to her bedroom, and she told Meredith what had been going on with defendant. She said that her mother then came home and that defendant came through the bathroom door into her bedroom and said, "Good job, girls." The victim testified that Meredith was the first person she told.
The victim testified that she received a phone call from Detective Gibbs when she was at home babysitting her little brother while her mother was at the marina and defendant was at a funeral. She stated that Detective Gibbs said that there was report of a rape and that she told Gibbs that she had the wrong number. The victim then called her mother who told her to press Star 69 to get the number. She did so and called back her mother to give her the number. She testified that she again spoke to her mother on the phone who asked her if the defendant had been molesting her. The victim told her mother "No," because she did not want anything to happen to them and to have her little *61 brother taken away from her. She then got a call from Ms. Partland who tried to reassure her; and while she was on the phone with Ms. Partland, defendant kept "beeping in." When she switched over, defendant asked her what she was going to tell the police; and, she told him that she was going to tell the truth. He then asked her, "Well, did I rape you?" She replied, "Yes;" and, when he asked her if that was what she was going to tell the police, she again said, "Yes." The victim testified that she clicked back over and told Ms. Partland that it was defendant, and Ms. Partland told her not to click over again. She further testified that her mother then came into the house and started cursing at her. Her mother took the phone from her and said that she needed to talk to her daughter. The victim testified that they sat down at the kitchen table and that her mother told the victim that it had happened to her when she was little. She stated that she told her mother, "Yes," when her mother asked if defendant had been molesting her. The victim said that defendant arrived about five minutes later. Her mother again asked her if defendant had molested her, and she again replied in the affirmative. She testified that defendant said, "[Victim], how could you do this to me?" She said that she was told that what he had been doing was wrong and that she was going to be examined, so she could not lie about it. She stated that as she heard Detective Gibbs walking up the stairs, defendant tried to hug her and told her, "Don't say nothing. Don't say anything. It's okay. It's between me and you only."
On cross-examination, the victim admitted that when she first spoke to Detective Gibbs, she did not tell Gibbs all of the things about which she had just testified. The victim admitted telling Gibbs that defendant had promised her a trampoline for her birthday if she would let him have sex with her one more time; and, she stated that she did not have sex with him and did not get the trampoline. She denied being mad about not getting the trampoline and telling Gibbs that she was mad at defendant for not getting her the trampoline after she let him do "something" to her. She was asked about her not being allowed to wear certain clothing and makeup and about not being allowed to talk to boys on the phone.
Elsie Yancey testified that she had known defendant and his family for many years and lived next to the marina where defendant and his wife worked. She further testified that on the date that defendant was arrested, she went with him to a wake and that she heard an argument between him and the victim as she walked to his truck. She stated that if defendant was not working at the marina, he was out hunting or doing errands for the marina.
Hugh Yancey testified that he had known defendant most of his life and that it was not often that defendant would not be at the marina. He further testified that it was defendant who usually closed the marina. He also testified that defendant's wife may have closed it on occasion.
Fran Lee Brauner, defendant's sister, testified that she and her family lived with defendant, the victim, her mother, and her older brother in the blue house; and, she said that there was not much privacy in that house. She also said that there were always people around the house. She further testified that her brother and his family lived in the house for a few months before she and her family moved in with him.
Crystal Hennesey, another sister of defendant, testified that she saw her brother and his family quite often and that she worked with him and his wife at the marina from April 1994 to June 1995. She *62 further testified that she and defendant were at the marina most of the time when it closed and that defendant's wife was sometimes there. She stated that it was not very often that defendant's wife would be there while defendant was gone.
William Lyncker testified that he had known defendant for eight years and that defendant was at the marina every morning at 5:00 a.m. He also testified that at closing time, he saw defendant more than his wife at the marina and that when he saw defendant's wife, the children were there as well.
Larry Orth testified that he and defendant had been friends for six years and that most of the time, defendant closed the marina. He further testified that when he was at the marina, defendant was there also. Kenneth Wilkerson testified that he had known defendant for ten years and that he spent time hunting and fishing with defendant.
Defendant testified and denied the victim's allegations against him. He stated that on the day he was arrested, he went to pick up the victim from school before going to a funeral; and, that she asked him to pay her for work she and Meredith had done around the marina the previous day. Defendant testified that he told her that she had not done any work and that all she and Meredith had done was run around and play with the boys. He said that the victim got angry about it and asked why she could not have a boyfriend or wear makeup. He told her that he was fed up and that when he came back from the funeral, he was going to have a talk with her, her mother, Meredith, and Meredith's mother. Defendant stated that when they got home, she started screaming at him; and he ordered her to go upstairs. He stated that while he was at the funeral, his wife called him and told him about a phone call from the police telling her that the victim had been molested. He said that as he drove home, he called on his car phone; and, when the victim answered, he asked her what was going on. She told him that nothing was going on; and he then asked her who had touched her. He testified that she told him that he was the one and that Ms. Partland and her daughter Keely were on the phone telling her what to tell the police. After that call ended, he called his wife at the marina to tell her about the victim's accusations. When he got home, the victim told him that she was going to get "tested for sex." He then asked her if she knew what would be done to him; and, he testified that she replied, "Well, if I tell the truth, all my friends will know I'm lying and then I won't have no friends left." Defendant further testified about various arguments he and the victim had had about her using the phone too much and getting too many pages on her beeper. He also testified about arguments concerning her use of makeup and having boyfriends. Defendant admitted on cross-examination that there were times when he and the victim were alone at home while her mother was out.
P.B., the victim's mother, testified that on the day defendant was arrested, she received a phone call from the victim telling her that someone had called. P.B. stated that she called the number her daughter gave her and talked to a detective who told her that her daughter had been molested. She related the phone calls between her and defendant about the victim's accusations against defendant. She testified that she then went home and found the victim on the phone with Ms. Partland. She got on the phone with Ms. Partland to ask why Ms. Partland had not called her. She said that she hung up when Ms. Partland started yelling at her. P.B. testified that when she questioned the *63 victim, the victim seemed confused and did not know what story to tell her. She testified that on those occasions when she closed the marina by herself, defendant was probably out with his friends.
Ronald Bodenheimer testified that he and defendant had been partners in the marina at Venetian Isles. He stated that he went to the marina at least once a month and that sometimes defendant would be there. He stated that defendant had the keys to his camp.

DISCUSSION

ERRORS PATENT
A review of the record reveals an error patent. The trial court imposed sentence without observing the twenty-four hour delay set forth in La.C.Cr.P. art. 873, and there is no indication in the record that defendant waived the delay. Failure to observe the delay is harmless where the defendant does not complain of his sentence on appeal. State v. Collins, 584 So.2d 356 (La.App. 4 Cir.1991). Defendant is complaining about his sentence in the present case; hence, this case should be remanded for resentencing. State v. Augustine, 555 So.2d 1331 (La.1990). There are no other errors patents.

ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, defendant complains that there is insufficient credible evidence to support the convictions.
The standard for reviewing a claim of insufficient evidence is whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact after could have found the essential elements of the offense proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; State v. Hawkins, 96-0766 (La.1/14/97), 688 So.2d 473. The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305 (La.1988). Additionally, the court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. Id. The trier of fact's determination of credibility is not to be disturbed on appeal absent an abuse of discretion. State v. Cashen, 544 So.2d 1268 (La.App. 4th Cir.1989).
La. R.S. 14:41 defines rape as an act of anal or vaginal intercourse with a male or female person committed without the person's consent; and, emission is not necessary and any sexual penetration, vaginal or anal, however slight, is sufficient to complete the crime. The essential elements of forcible rape are: (1) an act of vaginal or anal intercourse; (2) without the lawful consent of the victim; (3) where the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape. La. R.S. 14:42.1(A)(1); State v. Atkins, 97-1278 (La. App. 4 Cir.5/27/98), 713 So.2d 1168. Aggravated crime against nature is crime against nature committed when the victim is under the age of seventeen and the offender is at least three years older than the victim. La. R.S. 14:89.1(A)(6). La. R.S. 14:89 define a crime against nature as the unnatural carnal copulation by a human being with another of the opposite sex.
It appears that the State presented sufficient evidence to support the convictions. Clearly, the jury believed the *64 testimony of the victim over that of defendant. Her testimony was essentially consistent about the places where the acts of sexual abuse occurred. The jury did not abuse its discretion in its credibility determination. This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, defendant complains that he received ineffective assistance of counsel.
Generally, the issue of ineffective assistance of counsel is a matter more properly raised in an application for post-conviction relief to be filed in the trial court where an evidentiary hearing can be held. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Sparrow, 612 So.2d 191 (La.App. 4 Cir.1992). Only when the record contains the necessary evidence to evaluate the merits of the claim can it be addressed on appeal. State v. Seiss, 428 So.2d 444 (La.1983); State v. Kelly, 92-2446 (La.App.4Cir.7/8/94), 639 So.2d 888, writ denied 94-2087 (La.1/6/95), 648 So.2d 921. The present record is sufficient to evaluate the merits of defendant's claim.
Under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant must show that his counsel's performance was deficient and that deficient performance prejudiced him. With regard to counsel's performance, the defendant must show that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment. As to prejudice, the defendant must show that counsel's errors were so serious as to deprive the defendant of a fair trial, i.e. a trial whose result is reliable. Id. 466 U.S. at 687, 104 S.Ct. at 2064. Both showings must be made before it can be found that the defendant's conviction resulted from a breakdown in the adversarial process that rendered the trial result unreliable. Id. A claim of ineffective assistance may be disposed of on the finding that either of the Strickland criteria has not been met. State v. James, 555 So.2d 519 (La.App. 4th Cir.1989), writ denied 559 So.2d 1374 (La. 1990). If the claim fails to establish either prong, the reviewing court need not address the other. Murray v. Maggio, 736 F.2d 279 (5th Cir.1984).
If an error falls within the ambit of trial strategy, it does not establish ineffective assistance of counsel. State v. Bienemy, 483 So.2d 1105 (La.App. 4th Cir.1986). Moreover, hindsight is not the proper perspective for judging the competence of counsel's decisions because opinions may differ as to the advisability of a tactic; and, an attorney's level of representation may not be determined by whether a particular strategy is successful. State v. Brooks, 505 So.2d 714 (La.1987), cert. denied Brooks v. Louisiana, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).
Defendant's primary complaint is that his trial counsel did not use the victim's testimony from the Prieur hearing to impeach her trial testimony. He asserts that counsel's failure to do so was gross incompetence. First of all, this appears to be a strategic decision because defense counsel cross-examined the victim in an effort to establish a motive for her to fabricate the molestation accusations and presented defense witnesses to establish that defendant and the victim would not have been left alone while the victim's mother was closing the marina for the night.
Moreover, a comparison of the victim's hearing testimony with her trial testimony does not support this claim. His first claim of inconsistency is with regard to the victim's testimony about her "modeling" for defendant and her stating at trial that *65 defendant asked her to take her shirt off because he wanted her to be a stripper, whereas at the hearing the victim stated that defendant asked her if she wanted to be like the models on television. This is a relatively trivial difference and does not conflict with the thrust of the victim's testimony that the defendant had her model for him while clad only in her underwear into which he put money. The second alleged incidence of inconsistency concerns the victim's testimony about defendant's getting into the shower with her. At the trial, she stated that he got into the shower with her, while at the hearing she testified he made her get into the shower with him. Again, this inconsistency does not change the essential facts underlying the victim's testimony, namely that defendant forced her to shower with him. Defendant's third instance of alleged inconsistency-concerned defendant's being drunk and coming into the victim's bedroom early in the morning. At the hearing, she testified that her mother was out but she did not know where; but at trial, she stated that her mother was at the marina. Also, the victim testified at the hearing that defendant put his penis in her vagina; while at trial she testified he tried to but did not succeed in putting his penis in her vagina. This inconsistency could very well be due to the passage of time, and defense counsel may very well have not thought it significant enough to rise during the victim's cross-examination.
Defendant also argues that trial counsel was incompetent for not presenting expert medical testimony concerning the lack of physical evidence of sexual abuse. This does not appear to be a basis for a finding of incompetent counsel because trial counsel had both Dr. Anas and Dr. Tropez-Sims concede that the findings of the examination of the victim were consistent with a normal girl of the victim's age.
Defendant's third claim of ineffective assistance concerns his trial counsel's squandering his eleventh peremptory challenge on a juror removable for cause. During voir dire, Jacqueline Bullock testified that she had had three friends who had been raped by strangers. She stated that it would affect her ability to be a fair and impartial juror, but she said that she would try to be as fair as she could. She responded in the affirmative when asked if any part of her felt that defendant was guilty; and, she added that she had very strong emotions, which would probably affect her ability to be fair. Defense counsel did not move to challenge Ms. Bullock for cause and instead exercised a peremptory challenge.
It should be noted that defense counsel did move to challenge other prospective jurors for cause at this point in the voir dire; and, considering that Ms. Bullock did not unequivocally state that she could not be fair to defendant, defense counsel may well have thought that her response would not merit a challenge for cause. It may also have been, as argued by the State in its brief, a trial strategy decision. It does not appear that the failure to seek a challenge for cause constituted ineffective assistance.
In his supplemental brief, defendant asserts additional instances of ineffective assistance of counsel, namely his trial counsel's failure to object to the hearsay testimony of Dr. Khouri Anas and Meredith Partland, as noted in the discussion of Assignments of Error Nos. 3 and 4.
Defendant asserts that the testimony of Dr. Anas concerning what she was told by the victim was inadmissible hearsay. La. C.E. art. 803(4) provides that:

*66 The following are not excluded by the hearsay rule, even though the declarant is available as a witness: Statements made for purposes of medical treatment and diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis in connection with the treatment.
The Louisiana Supreme Court has stated that the use of the hearsay history of the case as told to the physician by the patient may be admissible if received not to show the truth of the facts stated but to show only the basis for the opinion; but only that part of the hearsay history necessary to the diagnosis is admissible. State v. Watley, 301 So.2d 332 (La.1974). In State v. Bennett, 591 So.2d 783 (La.App. 4 Cir.1991), this court found that the statements made by the victim to the doctor regarding the fact that she had been raped and, more specifically, that she had been held by the neck and forced to sit on her assailant's penis, were reasonably pertinent to the treatment and/or diagnosis by the doctor. These statements by the victim showed the purpose for the rape examination performed by the doctor and were not used to show the truth of the facts stated. However, the victim's statement to the doctor that she had been forced to drive to a secluded place was not reasonably pertinent to the treatment and/or diagnosis of the victim, and therefore, was inadmissible hearsay. However, this court held the erroneous admission of this statement was not reversible error because there was no reasonable possibility that this evidence contributed to the verdict in light of the other evidence of defendant's guilt, citing State v. Hayes, 414 So.2d 717 (La.1982); State v. Francis, 546 So.2d 1357 (La.App. 4th Cir.1989), writ denied, 551 So.2d 1336 (La.1989).
In State v. Lawrence, 98-0348 (La.App. 4 Cir. 12/1/99), 752 So.2d 934, the trial court admitted the testimony of two different doctors who had examined the victim of a sexual assault. The court found that the examination by one of the doctors was not for treatment purposes but was instead a forensic examination looking for evidence of sexual assault to confirm the victim's allegations. As such, the testimony of the doctor concerning what she had been told by the victim was inadmissible hearsay and was erroneously admitted by the trial court. The other doctor's testimony regarding what she had been told by the victim was admissible under Article 803(4) because that doctor was a treating physician. The court concluded that the inadmissible testimony constituted harmless error beyond a reasonable doubt.
In the present case, it appears that Dr. Anas' testimony about what she had been told by the victim was inadmissible hearsay because the purpose of her examination of the victim was to find evidence of sexual assault. However, the failure to object does not constitute ineffective assistance under Strickland. Defendant has failed to establish that he was prejudiced by this testimony considering the other evidence presented, namely the testimony of the victim herself and that of Meredith Partland.
As to the testimony of Meredith Partland, it appears to be non-hearsay as defined by La. C.E. art. 801(D)(1)(d), which provides that a statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is consistent with the declarant's testimony and is one of initial complaint of sexually assaultive behavior. The victim testified at trial and was cross-examined. *67 Meredith Partland was the first person the victim told, and her statements to Meredith were consistent with her testimony. Thus, counsel was not ineffective for not objecting to this testimony,
This assignment of error is without merit.

ASSIGNMENTS OF ERROR NOS. 3 & 4
In these assignments error, which defendant argues together, defendant complains that the testimony of Dr. Khouri Anas and Meredith Partland concerning what the victim had told them was inadmissible hearsay. A review of the transcript shows that no objection was lodged by defendant to the testimony of either witness on the basis of hearsay. Failure to object precludes appellate review. La. C.Cr.P. art. 841; La. C.E. art. 103. These assignments of error are without merit.

ASSIGNMENT OF ERROR NO. 5
In his fifth assignment of error, defendant complains that the trial court erred in allowing Dr. Susanne Tropez-Sims testify as an expert witness. He argues that Dr. Tropez-Sims should not have been allowed to testify about the reliability of the victim's reports of sexual abuse because this testimony was presented to bolster the victim's credibility before she even testified and to describe the harm likely caused to the victim by the abuse. He further argues that the testimony from Dr. Tropez-Sims as to why a patient's verbal history is so important in the examination of abuse victims was intended to enable the doctor to lend tacit support to the veracity of the victim's reports of abuse.
At trial, the State tendered Dr. Tropez-Sims as an expert in the field of pediatric and child sexual assault. Defense counsel objected because it was not a particular field of expertise and noted that she had testified that no board or agency recognized it. Defense counsel further argued that Dr. Tropez-Sims should not be allowed to testify beyond what was contained in her report.
In State v. Lewis, 95-0209 (La.App.4 Cir.4/13/95), 654 So.2d 761, this court held that trial judges have great latitude in deciding whether a prospective expert has the competence, background, and experience to qualify as an expert. The court further stated that the trial courts are vested with great discretion in determining the competency of an expert witness, and the rulings on the qualification of a witness, as an expert will not be disturbed unless there was an abuse of discretion.
Defendant cites State v. Foret, 628 So.2d 1116 (La.1993), as support for his argument. In Foret, the defendant was charged with molestation of a juvenile. The defense presented witnesses who testified that the victim had recanted her accusation. In response, the State presented two expert witnesses. One was the victim's physician, who testified, as did Dr. Tropez-Sims, which the lack of positive physical evidence gleaned from a physical examination of the victim was not unusual in that type of case. The State also presented the victim's psychologist who testified as to the characteristics of Child Sexual Abuse Accommodation Syndrome (CSAAS), which included a recanting phase, which occurs when a victim has been separated from her family due to the allegations of abuse in her home. When asked by the prosecutor if in his opinion the victim had been sexually abused, the psychologist responded that her behavior was consistent with the "dynamics" of sexual abuse and that therefore he concluded that she had been sexually abused.
On appeal, the issue before the Court was whether the trial court erred by allowing *68 the introduction of this evidence when the State waited until the morning of trial to inform the defense about the psychologist's report and of its intention to have the psychologist testify. In its opinion, however, the Court considered the actual propriety of allowing the doctor to testify concerning CSAAS and to render an expert opinion based upon the principles of CSAAS. In determining whether the psychologist's testimony would qualify as an expert opinion under La. C.E. art. 702, the Court adopted the test set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), "which set forth a means for determining reliability of expert scientific testimony and answered many questions as to proper standards for admissibility of expert testimony." Foret, 628 So.2d at 1121. The Court further stated:
The court replaced [the "general acceptance"] test of Frye [v. United States, 54 App. D.C. 46, 293 F. 1013 (1923)] with a new standard that requires the trial court to act in a "gate keeping" function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. This requirement stems from a belief that the rules on expert testimony serve to relax "the usual requirement of first-hand knowledge" to ensure reliability on the part of a witness. 509 U.S. at 593, 113 S.Ct. at 2796. This relaxation is justified so long as "the expert's opinion (has) a reliable basis in the knowledge and experience of his discipline." Id.

The reliability of expert testimony is to be ensured by a requirement that there be "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Id. This connection is to be examined in light of "a preliminary assessment" by the trial court "of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." Id. The court went on to make some suggestions as to how a court could fulfill its gate-keeping role. These involve whether or not the technique had been subjected to peer review and/or publication, the "known or potential rate of error", the existence of "standards controlling the technique's operation", the technique's "refutability" or, more simply put, testability, and, finally, an incorporation of the Frye general acceptance in the scientific community as only a factor in the analysis. 509 U.S. at 595, 113 S.Ct. at 2797.
The court also stated that other rules of evidence govern this testimony, mainly F.R.E. 403's balancing test that will exclude probative evidence if outweighed by its potential for unfair prejudice. [footnote omitted] The Court noted the possibility that the expert's testimony can be quite misleading and prejudicial if this gate keeping role is not properly satisfied, requiring a flexible approach and a careful evaluation of the methodology surrounding the testimony and its conclusions:
Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final, and binding legal judgmentoften of great consequenceabout a particular set of events in the past. We recognize that in practice, a gate-keeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes.

*69 Id. 113 S.Ct. at 2798. Foret, 628 So.2d at 1122.
The Court held that in order to qualify as expert testimony admissible under art. 702, the testimony must "rise to a threshold level of reliability" as per Daubert. Foret, 628 So.2d at 1123. Using the Daubert criteria, the Court discussed at length the failure of the psychologist's testimony concerning CSAAS to satisfy the requirements of admissibility. The Court noted that one problem with this sort of testimony was that the "dynamics" of CSAAS were intended for treatment purposes once instances of sexual abuse had been established, not for the purpose of determining whether the abuse had occurred. Despite this, CSAAS testimony was consistently used by prosecutors to bolster the credibility of the victim that abuse had occurred. The Court also noted the lack of general acceptability of CSAAS factors, the impossibility to "test" the reliability of these factors, and the relatively high "known or potential rate of error" associated with CSAAS factors.
The Court also addressed the actual "helpfulness" of CSAAS testimony to the jury in its determination of a victim's credibility, quoting from cases from various other jurisdictions, which had uniformly disallowed expert testimony concerning opinions as to sexual abuse victims' credibility because such testimony would invite the jury to abdicate its responsibility to determine if the victim was truthful. The Court stated:
Courts have also been concerned with unfair prejudice to the defendant from this type of expert testimony. Prejudice can result from the testimony's giving "factfinder[s] ... little more than a false sense of security based on the incorrect assumption that a reasonably accurate scientific explanation [for behavior] has been provided." Morse,[1]supra, at 1026. This testimony on credibility has the effect of "putting an impressively qualified expert's stamp of truthfulness" on a witness' testimony. Azure, supra, at 340.[2] This "stamp" has the effect of "so bolstering a witness' testimony ... [as to] artificially increase its probative strength with the jury and ... its admission may in some situations on this basis constitute reversible error." Homan v. United States, 279 F.2d 767, 772 (8th Cir.), cert. denied, 364 U.S. 866, 81 S.Ct. 110, 5 L.Ed.2d 88 (1960).
This bolstering of credibility has the effect of unfairly prejudicing a criminal defendant, and, as such, the use of CSAAS-based testimony for the purpose of bolstering a witness' credibility creates a risk of prejudice that outweighs its questionable probative value. Given the near unanimity of other jurisdictions' disapproval of CSAAS-based testimony as a determinant of abuse, coupled with our observations of the risk of prejudice inherent in CSAAS, this court now concludes that such opinion testimony, as a determinant of a victim/witness' credibility is not admissible. Foret, 628 So.2d at 1129.[3]
The Court did not entirely rule out the use of CSAAS evidence and theorized it might be used in a limited way to rebut *70 attacks on the victim's credibility.[4] However, the Court stated:
In the instant case, the expert testified as to his expert opinion on the victim's credibility, and did not limit his testimony to general information about possible psychiatric explanations for the delay in reporting. In fact, the expert based most of his opinion upon the "level of detail" of the child's description of the sexual abuse. He concluded with an objected-to summation that, in his expert opinion, the witness was telling the truth on that occasion as to whether abuse had occurred. This expert assessment of the witness' credibility was improper, making the trial court's overruling of the objection erroneous. Foret, 628 So.2d at 1130.
Using a harmless error analysis, the Court stated that it was not prepared to find beyond a reasonable doubt that this erroneously admitted testimony did not contribute to the jury's verdict. The Court further stated: "the state's case was based largely upon the testimony of the victim. The inadmissible expert testimony served to unduly bolster this testimony and, in all probability, made it much more believable to the jury. Consequently, the jury probably gave the testimony of the victim more weight than it, standing alone, would have otherwise received." Foret, 628 So.2d at 1130-1131. The Court additionally stated:
We noted early on in this opinion that no evidentiary hearing was held pursuant to the trial court's gate keeping function to determine the Daubert factors governing admissibility of the expert evidence presented in this case. Accordingly, our analysis of the issues is based on consideration of the information gleaned from prior reported cases and published literature on the subject matter. The rules established in this decision pertaining to this developing area are not necessarily static. These rules do not preclude consideration by a trial court, performing its gate keeping function via an evidentiary hearing, of the admissibility of psychological testimony in sexual abuse cases for certain limited purposes, based on current evidence bearing on the reliability and accuracy of this type of evidence.
As the State's use of CSAAS-based testimony was not so limited at the trial court, it constituted an improper comment on the victim's credibility, and served to unduly prejudice the defendant. As this prejudice created an error that was not harmless, we must and do hereby reverse the conviction and remand the case to the district court for a new trial. Foret, 628 So.2d at 1131.
In State v. Johnson, 94-1369 (La.App. 4 Cir. 3/16/95), 652 So.2d 1069, this court discussed the admissibility of expert testimony under Foret of two doctors who had examined the child victim of sexual abuse. One of the doctors stated that she rarely found evidence of trauma when conducting a rape examination of a child, and she also testified about the possible route of transmission of the anal warts found during her examination of the victim. Another doctor testified about characteristic behavior of a sexually abused victim. The admission of the testimony of the first doctor was found to be harmless error because the State had not established that the defendant ever had venereal warts or was a carrier of them. As to the second doctor's testimony, the court found that it was not precisely the type disallowed by Foret. The court *71 said that it was not necessarily a comment on the credibility of the victim.
The trial court did not abuse its discretion in admitting Dr. Tropez-Sims' testimony. She testified that an alleged abuse victim's history was necessary for the physician to make a diagnosis and to treat the victim. This particular testimony does not appear to be calculated as an attempt to boost the credibility of the victim. As to her testimony regarding reasons for delays in reporting, defendant objected on the grounds of relevancy, not that it was not within her field of expertise. A new basis for objection cannot be advanced for the first time on appeal. State v. Baker, 582 So.2d 1320 (La.App. 4 Cir.1991) writ denied 590 So.2d 1197 (La. 1992). Accordingly, this assignment of error is without merit.

ASSIGNMENTS OF ERROR NOS. 6, 7 & 8
In these three assignments of error, which are argued together in defendant's brief, defendant complains that the State provided insufficient notice of the charged crimes and of its intent to use other crimes evidence and that the trial court failed to require the State to elect which of the multiple acts of alleged abuse were covered by the three counts of the indictment. Defendant argues that the lack of notice deprived him of due process and his right to present a defense.
In State v. Barrow, 98-0374, p. 4 (La. App. 4 Cir.11/25/98), 724 So.2d 263, 265, this court stated:
In criminal prosecutions, "an accused shall be informed of the nature and cause of the accusation against him." La. Const. Art. I, § 13. The bill of particulars provided for in Article 484 of the Code of Criminal Procedure is a means by which a defendant is so informed. State v. DeJesus, 94-0261, p. 3 (La.9/16/94), 642 So.2d 854, 855. While the bill of particulars is not a means for the defendant to obtain the State's evidence, it should inform of the essential facts of the crime charged. Id. Therefore, if the trial court determines that the bill of information and/or bill of particulars is insufficient, it may quash the charges. La.Code Crim. Proc. Ann. art. 485. DeJesus, supra. An appellate court reviews such a ruling for abuse of discretion. State v. Atkins, 360 So.2d 1341, 1344 (La.1978), cert. denied, 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979); State v. Ross, 561 So.2d 1004, 1007 (La.App. 4th Cir.1990), writ denied in part, not considered in part, 594 So.2d 885 (La.1992).
The grand jury indictment charged that defendant committed: aggravated rape of the victim between June 1, 1992 through March 18, 1996; forcible rape of the victim between March 19, 1996 and March 31, 1997; and, aggravated crime against nature upon the victim between June 1, 1992 through March 31, 1997. In an amended answer to defendant's bill of particulars, the State responded:
One incident of aggravated crime against nature, approximately the summer of 1992, where the defendant resided at the time, a blue house over the Rigolet's [sic] Bridge.
One incident of aggravated rape near the end of the summer of 1992 or early in the school year of 1992 at the camp of Ronnie Bodenheimer around Venetian Isles, near Lake Catherine.
One incident of aggravated rape in the early fall of 1994 in the bedroom of the house located next to the marina in Venitian [sic] Isles.
Several incidents of aggravated crime against nature starting in the summer of 1994 into the fall of 1994 at the house *72 located next to the marina in Venetian Isles.
One incident of aggravated crime against nature and forcible rape in the Spring of 1996 in the living room of the apartment where the defendant resided in Venitian [sic] Isles.
One incident of forcible rape in November of 1996 in the apartment where the defendant resided in Venitian [sic] Isles.
One incident of forcible rape in February of 1997 in the apartment where the defendant resided in Venitian [sic] Isles.
One incident of forcible rape and aggravated crime against nature in March of 1997 in apartment where the defendant resided in Venetian Isles.
Defendant asserts that the evidence that the State put on at trial included acts of abuse not identified in the bill of particulars and that the victim's testimony was so unspecific as to imply multiple instances of rape at each location. He also argues that the State could have provided him with the specific date of one of the alleged incidents, namely the one that occurred when the victim had her first period.
In State v. Dixon, 628 So.2d 1295 (La. App. 3 Cir.1993), the defendant was charged with the aggravated rape of his girlfriend's seven-year-old daughter. The offense was alleged to have occurred between the beginning of 1991 through April 1992. The defendant complained that the trial court erred in allowing the State to introduce "other crimes" evidence without a Prieur notice of its intent to do so. The trial court found that a Prieur notice was not necessary; and, the Third Circuit affirmed this decision although for reasons different from those cited by the trial court.
The court noted that the purpose of a Prieur notice is to give the defendant an opportunity to test the relevancy, admissibility, and probative value of other crimes evidence prior to its introduction at trial and to give the defendant time to prepare a defense to the evidence of other crimes or acts. The court stated that in a prosecution for the commission of the rape of a minor, evidence of prior sex offenses committed by the defendant with the same prosecutor is generally admissible for reasons such as corroboration of the offense charged, to show intimate relations between the parties, the lustful disposition of the defendant, and the probability of his having committed the offense charged or to rebut an alibi. The court further stated that there was no need for a Prieur notice because although evidence of more than one occurrence was presented, all of the occurrences fell within the sixteen-month time range specified in the bill of particulars and involved the same prosecutor. The court stated:
Although only count of aggravated rape is generally charged, a range of time in which it occurred is often given in cases involving a continuing sexual relationship. See State v. Osborne, 593 So.2d 888, 891 (La.App. 2 Cir.1992); [State v.] Kohl, 524 So.2d [781] at 784; State v. Fisher, 507 So.2d 1263, 1266 (La.App. 3d Cir.1987), writ denied 551 So.2d 1328 (La.1989); State v. Frith, 436 So.2d 623, 627 (La.App. 3d Cir.), writ denied, 440 So.2d 731; [State v.] Case, 357 So.2d [498] at 499. Therefore, the evidence of any aggravated rape by the defendant of the same victim within that time frame is evidence of the crime with which the defendant is accused; it is not evidence of "other crimes."
In the case before, the defendant was in no danger of being convicted of some other crime than that for which he was on trial or because he is a man of criminal *73 character. See State v. Sutfield, 354 So.2d 1334 (La.1978). Nor was the defendant in danger of being tried for charges of which he had no notice or for which he was unprepared and which unfairly prejudiced him in the eyes of the jury. See [State v.] Goza, 408 So.2d [1349] at 1353. Defendant was simply tried for the crime with which he was charged and he was given sufficient notice of the crime through the bill of particulars. No evidence of other crimes was introduced and, therefore, a Prieur notice of the State's intent to introduce other crimes evidence at trial was neither required nor necessary.
Finally, we note that the sixteen-month time frame alleged for the commission of the crime is not too general or too long. The date of the offense is not an essential element of the crime of aggravated rape. Frith, 436 So.2d at 626. Also, Fisher, 507 So.2d at 1266. In a continuing relationship of this type, exact dates often cannot be supplied. Kohl, 524 So.2d at 784, and cases cited therein. Moreover, the extreme youth of the victim in this case poses even more problems in obtaining exact dates. It was not necessary for the State to specify the date of an offense in the indictment or the bill of particulars, and any one of the offenses committed within that time frame could be proven to obtain a conviction for the crime with which defendant was charged. State v. Dixon, 628 So.2d at 1298-1299.
Defendant had sufficient notice of the offenses charged in order to defend himself against the charges. The date of the offenses was not essential; and, it should be noted that a Prieur hearing was held in the present case at which the victim testified. Because the "other crimes" evidence in this case involved the same victim, such notice was unnecessary. It should be noted that during trial, defendant made no objection to the victim's testimony on the basis of surprise. These assignments of error are without merit.

ASSIGNMENTS OF ERROR NOS. 9 & 10
In these two assignments of error, which are argued together in defendant's brief, defendant complains that improper arguments and comments from the prosecutor prejudiced him. A review of the transcript of closing argument shows that defendant to the prosecutor's comments lodged only one objection, and the trial court sustained that objection. Defendant's failure to object precludes appellate review of these issues. La.C.Cr.P. art. 841.

ASSIGNMENT OF ERROR NO. 11
In this assignment of error, defendant complains that the trial court erred in dismissing a sworn juror who was absent from the jury room at the close of voir dire. He argues that the trial court should not have replaced this juror with an alternate without first ascertaining whether the juror was incompetent to serve or attempting to locate her.
La. C.Cr.P. art. 789 provide for the replacement of a juror with an alternate in the event that the juror becomes unable to serve or is disqualified prior to the time the jury retires to consider its verdict. In State v. Hawkins, 496 So.2d 643 (La.App. 1st.Cir.1986), the trial court replaced a juror with an alternate following an unsuccessful search for the juror who had failed to appear for the second day of trial. The First Circuit found no abuse of discretion in the trial court's action because its decision alleviated any further trial delay which might have resulted from further effort to locate the missing juror.
*74 In the present case, it does not appear that the trial court abused its discretion in disqualifying the juror who was missing from the jury room and replacing that juror with an alternate considering that testimony in the trial had yet to begin. This assignment of error is without merit.

ASSIGNMENTS OF ERROR NOS. 12 & 13
In these two assignments of error, defendant complains that the trial court imposed excessive sentences. He argues that the trial court failed to consider any of the mitigating circumstances and that the maximum sentences were not warranted.
Although a sentence is within the statutory limits, the sentence may still violate a defendant's constitutional right against excessive punishment. State v. Sepulvado, 367 So.2d 762 (La.1979). A sentence is unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless and needless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Lobato, 603 So.2d 739 (La.1992); State v. Telsee, 425 So.2d 1251 (La.1983).
A reviewing court must determine whether the trial judge adequately complied with the sentencing guidelines set forth in La. C.Cr.P. art. 894.1 and whether the sentence is warranted in light of the particular circumstances. State v. Soco, 441 So.2d 719 (La.1983); State v. Anderson, 97-2587 (La.App. 4 Cir. 11/18/98), 728 So.2d 14. If adequate compliance with Article 894.1 is found, the reviewing court must then determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of his case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense charged. State v. Quebedeaux, 424 So.2d 1009 (La.1982). The trial judge has wide discretion in sentencing, and a sentence should not be set aside absent the manifest abuse of that discretion. State v. Sweeney, 443 So.2d 522 (La.1983).
At the sentencing hearing, Fran Lee Brauner, Crystal Hennesey, and Kim Bacques all testified on behalf of defendant; and, the prosecutor read a letter written by the victim. In imposing the maximum sentences, the trial judge stated that the acts committed by defendant were abhorrent, repugnant, and egregious. The court further stated that any crime against a child is inexcusable.
In State v. Frith, 32,796 (La. App.2Cir.12/8/99), 747 So.2d 1269, the trial court imposed a sentence of twenty years at hard labor, with ten years without benefit of parole, probation, or suspension of sentence, on a defendant convicted of the forcible rape of his thirteen-year-old biological niece. The sentence was not found to be excessive.
In State v. Ledet, 96-0142 (La.App. 1 Cir.11/8/96), 694 So.2d 336, writ denied 96-3029 (La.9/19/97), 701 So.2d 163, the defendant was sentenced to fifteen years for the forcible rape of his twelve year old daughter. The First Circuit did not find the sentence to be so disproportionate as to shock the sentence of justice.
In State v. Adkins, 31,300 (La. App.2Cir.11/9/98), 721 So.2d 1090, the defendant was convicted of the forcible rape of his girlfriend's three daughters, all of whom were under the age of twelve; and, he was sentenced to forty years at hard labor on each count with the first two years to be without benefit of parole, probation, or suspension of sentence. The *75 Second Circuit did not find the sentences to be excessive. The defendant had a prior felony conviction; and, the court noted that defendant had been charged with aggravated rape, which carried a life sentence. The court stated that the maximum sentences, which ran concurrently and were subject to the minimum without benefits, did not shock the sense of justice.
Comparing the sentences in this case with those in the above-cited cases, it does not appear that the trial judge adequately justified the imposition on defendant of the maximum sentences which were to run concurrently and without benefit of parole, probation, or suspension of sentence for their entirety, considering that defendant did not have any prior convictions and that he presented evidence of mitigating circumstances. The sentences should be vacated and the case remanded for resentencing.

ASSIGNMENT OF ERROR NO. 14
In his final assignment of error, defendant complains that the record is incomplete and precludes adequate appellate review of the proceedings below. He particularly complains about the omission of portions of the voir dire and several pretrial hearings.
The state constitution provides that "[n]o person shall be subjected to imprisonment... without the right of judicial review based upon a complete record of all evidence upon which the judgment is based." La. Const. Art. I, § 19. In felony cases, the recording of "all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel" is statutorily required. La. C.Cr.P. art. 843. This court has recognized that a complete appellate review of a defendant's conviction and sentence can be accomplished even when there are missing portions of the trial record. In State v. Thomas, 92-1428 (La.App. 4 Cir.5/26/94), 637 So.2d 1272, writ denied, 94-1725 (La.11/18/94), 646 So.2d 376, cert. denied, Thomas v. Louisiana, 514 U.S. 1054, 115 S.Ct. 1437, 131 L.Ed.2d 317 (1995), this court found that the record was adequate for full appellate review. Missing from the appeal record were transcripts of the voir dire, jury instructions, opening statements, and closing arguments. The court noted that "[b]ecause the missing portions of the trial record are not evidentiary, their absence does not compromise the defendants' constitutional right to a judicial review of all evidence." Thomas, at 1274. In addition, the minute entries of trial did not indicate that the defendant made any objections during the proceedings missing from the record.
Also, in State v. Lyons, 597 So.2d 593 (La.App. 4 Cir.1992), this court concluded that the appellate record was adequate for review although transcripts of the voir dire, the impaneling of the jurors, opening statements, and a portion of the jury charges were missing. The court noted that the defendant had made no specific assignments of error as to the missing portions of the record except the fact that they were missing.
Defendant asserts that there is nothing in the voir dire transcript to support the challenge for cause granted to the State for Lawrence Despenza, but there is no defense objection to the trial court's granting the challenge for cause. He also argues that the transcript of the Prieur hearing contains only the victim's testimony, but he makes no specific allegations of error. The present record is sufficient for a complete appellate review of defendant's convictions and sentences. This assignment is without merit.

*76 CONCLUSION

Accordingly, the defendant's convictions are affirmed, and his sentences are vacated and the case remanded for resentencing.
CONVICTIONS AFFIRMED AND REMANDED FOR RESENTENCING.
NOTES
[1] Morse, "Failed Explanations and Criminal Responsibility: Experts and the Unconscious", 68 Va. L. Rev. 971 (1982).
[2] United States v. Azure, 801 F.2d 336 (8th Cir.1986).
[3] See also La. C.C. 403, which provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."
[4] Indeed, the Court has since used CSAAS factors pertaining to delayed reporting of sexual abuse in its determination of whether a tort suit arising out of sexual molestation of a juvenile had prescribed. Wimberly v. Gatch, 93-2361 (La.4/11/94), 635 So.2d 206.